## Green *versus* Humphry.

*Effect of payment in counterfeit money on title to personal property sold.— Good faith in vendee of chattel thus paid for, a question for the jury.*

1. The payment in counterfeit money for goods does not divest the title of the owner, except as against a subsequent *bonâ fide* purchaser for value.

2. In replevin for a horse, bought with counterfeit money, and subsequently sold on the streets of a city for a price below the value of the animal, it is for the jury to determine whether, under all the circumstances of the case, the purchase was made in good faith and for value.

3. Hence, where the jury were instructed to find for the defendant, if from the facts they found that he bought the animal in good faith and was a *bonâ fide* purchaser, the instruction was not erroneous.

ERROR to the Common Pleas of *Dauphin county*.

This was an action of replevin by Samuel Humphry against A. T. Green, for a bay mare, in which the defendant claimed property and gave bond to the sheriff. To a declaration in the usual form the defendant pleaded *non cepit*.

The material facts of the case were these :—

The plaintiff below, Samuel Humphry, about the 10th of June 1864, sold to a stranger calling himself Wallace, a mare for $115. He received in payment fifteen dollars in good money, and one hundred counterfeit. The counterfeit money was afterwards paid out by Humphry, but was returned to him.

Several days after the above purchase and sale, the same mare was offered for sale to a number of different persons in Harrisburg, about eighteen miles from where she was first purchased, who refused to buy because the mare was in bad condition, and not worth in their estimation the price asked for her. She was finally purchased by A. T. Green, the defendant below, for the price asked, $45, twenty-five of which was paid.

Humphry then brought this action of replevin to recover the

[Green *v.* Humphry.]

mare from the defendant A. T. Green, the plaintiff in error claiming that his mare was obtained from him feloniously, that no title passed from him, and that he had the right to take her wherever he could find her.

The court below (PEARSON, P. J.), after stating the facts, instructed the jury as follows :—

"It is the settled law of this state, that we have no market overt which will protect a purchaser in the possession of stolen property, and it is equally clear that when property is stolen, the owner thereof can seize it in whosesoever hands it may go. No number of open public sales can divest him of his goods. But where the owner is induced to part with his effects through fraud and trick, although he can recover them from the wrongdoer, he cannot from his *bonâ fide* vendee—one who purchases without notice of the fraud, or of such facts as would put a man of prudence upon inquiry. It is said, however, that as paying counterfeit money of this kind, knowing it to be such, is a felony, therefore the property was feloniously acquired, and consequently no title passed. As we understand the law, this property was not obtained feloniously, but by contract, and the purchaser was guilty of a felony in making payment in the manner he did. The purchaser clearly could not be convicted of larceny for so procuring the mare, but would have to be punished for passing the counterfeit money. The felony may be said to be collateral to obtaining the property. The payment in counterfeit money neither pays a debt nor divests the owner of his goods, but he may sue for one or recover the other from his vendee by replevin, or maintain trover for their value, but cannot sustain either against a *bonâ fide* purchaser for value. Is Green such a purchaser ? That is a question for you under all the circumstances proved. [The principal evidence from which the jury can infer that there was *mala fides* on his part, is the very low price at which the mare was offered. The man was probably leading her through the street with a blind bridle, offered her for sale for $40 or $45, and the witnesses testify that she was worth $100. Was this sufficient to put a man of ordinary prudence and caution on inquiry as to how the person obtained her ? Did that inquiry become a duty ? If from the circumstances the purchaser had reason to believe that the animal was feloniously or fraudulently obtained, and made no inquiry, but rashly purchased, he can scarcely be said to have bought in good faith ; but whether he did or not is a question for the jury. If you are satisfied that he did not, then the owner can recover against him the same as against Wallace or Richardson. If he purchased *bonâ fide* the owner cannot recover. Whether the price asked and paid was or was not so wholly inadequate or disproportionate as to be evidence of *mala fides*, is for you to decide.] There might be cases so gross as to strike one at once, as where a horse worth $100

[Green *v.* Humphry.]

should be offered and sold for $5, the jury would perhaps have no difficulty in saying the purchase was not *bonâ fide*, but when it comes up to nearly half the market value the question is one of greater difficulty. We cannot even then determine it as one of law, but it must be left to the jury under all the surrounding circumstances. We have convicted persons for receiving stolen goods, knowing them to be stolen, when their receipt was attended with circumstances of suspicion, one of which is a valuable article worth six or ten dollars being offered for twenty-five cents. But that is an extreme case as to price, this is one of those intermediate cases which must be determined by a jury taking all the circumstances into consideration—the man, a stranger, leading the mare through the streets, and offering her for less than half her market value to Green, although other witnesses state that up the road he had asked more than they thought her worth. The price asked of them is not recollected. But $25 were paid. Had he paid nothing Green would scarcely claim, as against the owner, to be a *bonâ fide* purchaser. In such cases payment to the vendor could be successfully resisted, and hence the owner would not lose his property merely to give the purchaser the benefit of his bargain. The man must buy and pay in good faith, but as a large portion was paid the sale would not be affected by the want of payment in full without more.

" [The defendant says that as the plaintiff received a portion of the price in good money, the sale cannot be set aside. There might be cases where it could not, and others where it could. If a man should buy an article at $100, and pay all in cash except five or ten dollars in counterfeit money, the remedy of the vendor would be, not to seize the property, but sue for the unpaid portion of the price—that given in counterfeit notes being no payment. But if five dollars were paid in good money and ninety-five in counterfeit, the owner might offer to refund the five dollars and regain his property. In the present case the proportion between the good and bad money is very great. In addition the jury will perhaps believe that the payer knew the money to be counterfeit, when he can scarcely invoke the principle of being a purchaser. Should you find for the plaintiff, the measure of damages should be the value of the mare, deducting the fifteen dollars paid, with interest from the time of sale, as that is the extent to which he is injured, and the present holder can invoke the aid of the payment to lessen the damages.] If Green bought in good faith, using ordinary prudence, your verdict will be in his favour. We will answer defendant's point in the negative. For our opinion on the law of the case we refer to the general charge."

This writ was then sued out by the defendant, who averred that the court below erred in refusing to instruct the jury as requested by defendant in the point submitted, to wit:

[Green v. Humphry.]

"The evidence shows that the plaintiff parted with his right of property by a sale of the animal in question, and has failed to produce any evidence tending to show even by implication that the defendant was party to the alleged fraud. The defendant, therefore, respectfully asked the court to instruct the jury to find for the defendant. 'This point answered in the negative so far as regards the final instruction asked.'"

And in all that part of the charge printed above in brackets.

*David Mumma*, for plaintiff in error.

*Hamilton Alricks*, for defendant in error.

*The opinion of the court was delivered, May 24th 1865, by

READ, J.—The charge of the court in this case was quite as favourable as the defendant could reasonably ask, and the question was fairly submitted to the jury, under proper instructions. The purchase from Humphry by a man calling himself Wallace for $115, of which $100 was counterfeit money, and for which the purchaser was arrested, but succeeded in escaping, was clearly fraudulent, and the horse could have been recovered back from him, and of course from any person purchasing from him, who was not a *bonâ fide* purchaser for value. The purchaser afterwards calling himself Richardson, subsequently sold her publicly in the streets of Harrisburg to the defendant under the circumstances described in the testimony, for $40 or $45, of which only $25 was paid, and of course no more ever was paid to the passer of the counterfeit money.

The only question therefore was, Was Green a *bonâ fide* purchaser for value? Did he purchase in good faith, or were not the circumstances such as to justify the jury in finding that he was not such a *bonâ fide* purchaser? The jury did so find, and gave a proper verdict for the plaintiff. The charge of the court was eminently proper, and they would have committed a manifest error if, as requested by the defendant's counsel, they had instructed the jury to find for the defendant Green.

Judgment affirmed.