JOHN P. O'CONNOR v. JACOB GERTGENS.[1]

April 4, 1902.

Nos. 12,757—(124).

## Public Land—Withdrawal from Sale.

The secretary of the interior possesses full power to withdraw public lands from settlement and market at will, and when he acts in this respect it is deemed an act of the president. It seems to be quite immaterial what may be the basis of the order of withdrawal, or what public land it affects.

## Land Grant—Repealing Act—Executive Order.

By the congressional land grant act of March 3, 1865 (13 Stat. 526), it was made the duty of the secretary of the interior (section 7) to withdraw lands in aid of the grant therein provided for. Subsequently, by section 5 of the act of congress of September 29, 1890 (26 Stat. 496), section 7 was repealed. Held, that this repeal did not revoke or annul an executive order previously made whereby certain lands had been withdrawn from the public domain for the benefit of the grant.

## Purchase of Land not in Grant—Perfecting Title in Purchaser.

By the fifth section of an act of March 3, 1887 (24 Stat. 556), it was provided that when railroad companies had sold lands, as parts of their grants, coterminous with their constructed lines of road, to citizens, or to persons who had declared their intention to become citizens, but for some reason these lands were excepted from the operation of the grants, and could not be conveyed to the companies, these citizens or persons, if "bona fide purchasers," should have the right to buy of the government, and should thereupon be entitled to patents. Held, that this section must be construed liberally, with a design to effectuate its object, and that citizenship, or declaration of intention to become a citizen, and a bona fide purchase, are the essentials required by its terms. Held, further, that the right of one who purchased land from a railroad company, prior to the passage of the act of March 3, 1887, to perfect title under section 5 of that act, is superior to the settlement right of another person, acquired after the passage of said act.

## Uniform Construction of Statute.

Where there has been a long and uniform course in construing a

[1] Reported in 89 N. W. 866.

85 M.—31

statute in a tribunal charged with the duty of executing it, such construction is always entitled to the most respectful consideration by the courts, and ought not to be overruled without cogent reasons.

## Bona Fide Purchaser.

The expression "bona fide purchaser" is oftentimes used ambiguously, and is construed in various ways. The context must be examined, and the expression considered with reference to its use and the connection in which it is found. It may mean without fraud or deception. It may mean without notice of others' rights. It sometimes signifies honesty of purpose as distinguished from bad faith. To be a bona fide purchaser may under some circumstances require the payment of the consideration or purchase price, but not always. In the statute in question the term "bona fide" was used as the opposite of "mala fide." *Held*, in the case at bar, following the rulings of the appropriate officers of the land department, that the plaintiff's grantor, to whom the patent was issued, was a bona fide purchaser of the land in dispute, within the meaning of said section 5.

## Jurisdiction of Land Department—Decision Conclusive.

It is well settled that authority to hear and determine all questions of fact arising in the land department of the general government is exclusively within the control of the appropriate officers of that department. The jurisdiction thus conferred is judicial in its nature, and the decisions of the department officers, when acting within their jurisdiction, are final and conclusive, in the absence of fraud or imposition or mistake.

## Same.

The same rule applies where the question presented to the department officials is one of mixed law and fact. Their decision is equally as conclusive as to the fact involved.

Action in ejectment in the district court for Traverse county. The case was tried upon an agreed statement of facts. From a judgment in favor of plaintiff, entered pursuant to the order of Webber, J., defendant appealed. Affirmed.

*F. W. Murphy, Thomas Kneeland, L. C. Spooner* and *Stockslager & Heard*, for appellant.

*E. T. Young* and *Stevens, O'Brien, Cole & Albrecht*, for respondent.

COLLINS, J.

This is an action in ejectment to recover possession, under a claim of ownership, of one hundred sixty acres of land in Traverse

county; the complaint being in the ordinary form. The answer admitted that plaintiff had paper title derived from the grantee named in the United States patent, but, in the form of a cross bill, set up equitable matter upon which defendant claims he should have received the patent from the government, and demands that the title be decreed to be held in trust for his use and benefit, and that plaintiff be required to convey the land to him.

The tract involved was originally included within the indemnity limits of the grant of lands in aid of the main line of the St. Paul, Minneapolis & Manitoba Railway, of March 3, 1857 (11 Stat. 195), and March 3, 1865 (13 Stat. 526). Soon after the filing of the company's map of definite location by commissioner's letter dated May 25, 1869, received at the local land office June 3, 1869, the lands within said indemnity limits, including this tract, were duly withdrawn from settlement and market, for the benefit of the grant. April 22, 1885, all the lands within said indemnity limits were selected by the company on account of asserted losses along its main line; and thereafter, in August, 1891, the selection list was amended, by consent of the land officers, by a withdrawal of the specification of losses as first filed, and substituting therefor a specification of losses arising in the grant for the "St. Vincent Extension" of said railway. By act of congress approved September 29, 1890 (26 Stat. 496), section 7 of the act of March 3, 1865, making it the duty of the secretary of the interior to withdraw the lands from market, was repealed.

May 22, 1891, the secretary gave direction to the commissioner of the general land office that, after due notice, all lands theretofore withdrawn for indemnity purposes under the land grants in question should be restored to the public domain for settlement and entry; but, of itself, this direction did not affect the previous order of withdrawal. Counsel for defendant are in error when asserting that the secretary's action revoked the order. On May 28 of the same year the commissioner directed the register and receiver of the St. Cloud district, in which this land was situated, to restore to the public domain, and open to settlement and entry, all lands in the district theretofore withdrawn, situated within the indemnity limits of the grant, "not embraced in selections

heretofore made or applied for by said company." This order, as will be seen, expressly reserved from its operation all lands which had been selected or applied for by the company, and among them was this particular tract of land. It expressly directed that there be opened to settlement and entry all indemnity lands not selected or applied for, but in no manner did it revoke the previous order of withdrawal, in so far as that order and the subsequent selection affected and withdrew from the public domain the one hundred sixty acres in dispute.

March 21, 1894, the secretary issued an order to the commissioner wherein he considered said last-mentioned selection, and, after holding that the company had attempted to make selections for losses on its main line to the amount of two hundred thousand acres in excess thereof, directed that action be suspended in respect to selections on account of the St. Vincent Extension until further advices from his department. This order of suspension was revoked October 1, 1895, with directions to the commissioner to adjust the grants. January 13, 1896, the commissioner ordered the company to show cause why the suspension upon indemnity selections made by the St. Vincent Extension should not be revoked, "and the applications of settlers to make homestead entries for said lands be taken up and considered in connection with said selections." July 17 of the same year the commissioner rendered a decision relative to indemnity selections as to lands in the St. Cloud district, and held the same for cancellation, subject to appeal. October 23, 1896, no appeal having been taken by the company, the commissioner rendered a decision finally cancelling all indemnity selections in the St. Cloud land district; but in this order, as well as in the decision of July 17th, was this significant paragraph:

"A large portion of these lands have been applied for by parties claiming them under the settlement laws, and by John Ireland, who claims under the act of March 3, 1887 (24 Stat. 556), as a purchaser from the St. P., M. & M. Ry. Co. No disposal will be made of these lands until the above claims are adjudicated by this office. So advise the parties in interest."

From this it will be noticed that the order whereby indemnity

lands were restored to the public domain expressly excluded from its operation certain tracts which had previously been applied for, and that its effect was to restore a part only of the lands which had previously been *withdrawn from public entry. As to the remainder there was no revocation of the withdrawal order, and among these was the particular tract in controversy. As to it the original order of withdrawal remained in full force, because at that time the tract was claimed by two parties,—one, the Right Reverend John Ireland, who asserted a claim and right under the act of congress of March 3, 1887, as a bona fide purchaser from the railroad company; the other, this defendant, who based his claim upon the following facts:

Prior to April, 1891, the one hundred sixty acres was unoccupied; but during said month defendant, being in all respects duly qualified as a homestead claimant under the laws of the United States, entered upon and took possession of the same, has ever since continued and still does continue in such possession, claiming to occupy said tract as a homestead, under the laws of the United States, in good faith, and believing that no valid railroad claim existed when he took possession, and that the tract was, or soon would be, restored to homestead entry. He has made valuable improvements, including the building of a house and the cultivation of a large portion of the land. November 27, 1895, he presented to and filed with the register and receiver a homestead application for said tract of land, accompanied by the proper (legal and sufficient in form) homestead affidavit, together with a tender of lawful fees and commissions; performing every act required of a homestead applicant. December 2, 1895, said register and receiver rejected his homestead application on the ground that the land was within the twenty-mile indemnity limits of the railway company's main-line grant, and was selected by it April 22, 1885. In due time defendant appealed from said rejection to the commissioner. February 3, 1898, the latter rendered a decision sustaining the action of the register and receiver; and on appeal, January 20, 1899, the secretary filed his decision sustaining that of the commissioner. April 24, 1899, the secretary denied a motion filed by defendant's attorneys for a review of his deci-

sion. The officials of the land department, without exception, expressly refused to recognize the defendant's claims.

February 8, 1896, John Ireland, before mentioned, being a citizen of the United States, and resident of the city of St. Paul, in the state of Minnesota, over the age of twenty-one years, made application to the St. Cloud land office for leave to purchase from the government this and other tracts of indemnity lands, under the provisions of the fifth section of the act of congress before mentioned. This application was considered by the department, and reference was made thereto in a number of communications to the local land office. A final hearing thereon was afterward ordered; the controversy being between the applicant, Ireland, and certain settlers (among them, this defendant), who had protested, and who contended that Ireland had no right to purchase any of the land under the congressional act. On the order of the land commissioner, evidence was taken, both Ireland and the defendant appearing and taking part therein; most of the facts being stipulated. The proofs being submitted, the register and receiver at St. Cloud rendered their decision March 16, 1897, holding that Ireland was qualified and entitled to purchase under the act, and rejecting defendant's application under the homestead law. An appeal was taken to the commissioner, and his decision, of date February 3, 1898, sustained that of the local officers. On appeal to the secretary of the interior, his decision, rendered January 20, 1899, upheld that of the commissioner. A motion to review this decision was overruled by the secretary in April following. After this, in obedience to instructions, the register and receiver permitted Ireland to enter and pay for the land in controversy, and other tracts and patents were thereafter duly issued to him. The plaintiff, through a contract of date March 3, 1898, and a subsequent conveyance, has succeeded to Ireland's title and interest in this particular tract, but with full notice and knowledge of defendant's claims and rights. The latter insists that Ireland was not a bona fide purchaser of the one hundred sixty acres, within the meaning of the fifth section of the act of March 3, 1887; that the officials of the land department misunderstood that section, erred in their construction of the law, misapplied the

same to the facts; and for these reasons he demands that the plaintiff be declared trustee of the naked legal title for his own use and benefit.

At the trial the court below made findings of fact, and ordered judgment in favor of plaintiff for immediate possession of the entire tract, and for his costs and disbursements. A case was settled, embracing the evidence, and this appeal is from the judgment thereafter entered.

Ireland's right to purchase the land was based upon two written agreements entered into between him and the railroad company, —one dated July 17, 1880, and the other March, 30, 1883. The first gave to him

"Until the 31st day of December, 1881, the sole and exclusive right and authority to place settlers upon and of making sales or agreements of sale, to parties desiring to settle upon or purchase the same, all those tracts and parcels of land situate in the counties of Big Stone and Traverse, in the state of Minnesota,"

described in attached schedule as having been selected by said company, under its grant, as indemnity lands. An additional list of lands was afterwards included in this schedule.

Subsequent to the execution of this contract, and prior to March 30, 1883, Ireland, acting under it, sold to and located a number of settlers upon some of the scheduled lands, giving to each a receipt for money paid, and an obligation to convey the land as soon as the railroad company perfected its title, or, if the land should revert to the government, an agreement to return the money, which in each instance was one-tenth part of the agreed purchase price, and in some cases a year's interest in addition. The second contract, of March 30, 1883, recited the fact of the execution of the first, that it had expired on December 31, 1881, and that the railroad company had not yet a title to the lands therein scheduled. It was then stipulated that when the title to the lands covered by this second contract (a part only of those embraced in the first) should be perfected in the company, and notice thereof given to Ireland, he should have the privilege and right, for the term of sixty days thereafter, to purchase for himself, or for such parties as he might designate, subject to rights acquired by set-

tlers prior to the date of the first contract, lands, not to exceed fifty thousand acres in amount, at the uniform price of four dollars per acre. There were provisions in respect to payment of the purchase price, the rate of interest, and the enforcement of the contract, which are not here material, being mere details.

Under his first contract with the railroad company, Ireland expended large sums of money and devoted a great deal of time to a colonization enterprise, and the expenditure and labor were kept up until 1883; large numbers of people being thereby induced to settle in a new country tributary to the line of road belonging to the company. By it the company constituted Ireland its mere agent to make sales of the lands therein scheduled, to receive payment thereon, and to bind it to convey when its title should be perfected, or to return the money paid in case it failed to obtain title. The agreement of March 30 was wholly different. The agency was at an end. Ireland was given the right to purchase for himself and for others fifty thousand acres at a stipulated price per acre, and upon certain terms. The company could not then convey, when it could was uncertain, and it was agreed that purchasers should not be obliged to pay any part of the purchase price until it was within the power of the company to give good title. This was the construction placed upon the contract by the parties thereto, and it was the rational and proper one. Ireland proceeded under this contract, as he had under the first, to secure purchasers for these lands. They became actual residents, and received contracts for conveyances. He expended much time and large sums of money in the scheme to populate the country in question, and his success was very noticeable. All this appeared at the trial, and while we are of the opinion that his good faith was not then or there an open question, for reasons hereinafter stated, the proof tended to establish the fact, as it undoubtedly had when the question of his bona fides was before the officers of the land department.

By the act of congress it was provided that when railroad companies had sold lands, as parts of their grants, coterminous to their lines of road, to citizens, or to persons who had declared their intention to become citizens, but for some reason these lands were

excepted from the grants, and could not be conveyed to the companies, these citizens or persons, if "bona fide purchasers," should have the right to buy of the general government, and should thereupon become entitled to patents. It gave paramount rights to purchasers, if their good faith was established, conferring upon such as could show their qualifications a positive right, which could not be curtailed or defeated by any act of the officials of the land department, to enter, purchase, and pay for certain lands, which were then beyond the reach of the ordinary settler, because withdrawn from settlement. Nor were there any settlers on the lands at that time, so that the power of congress to deal with the same was unrestricted. And this law was in force when defendant first made settlement. It was under it that the government finally awarded and issued the patent for the quarter section. Counsel really concede that if, as a matter of law, Ireland could not acquire title thereunder, he cannot prevail in this action; that his right to recover depends upon the strength of his own title, and, if he has none, it is immaterial to him what claim the defendant in actual possession has or can assert.

We are of the opinion that there are two or three well-settled rules of law relative to the conveyance of land by the government which control and are conclusive of the plaintiff's rights in this action of ejectment.

1. By executive order of June 3, 1869, this tract of land was withdrawn from settlement, and it has never been unqualifiedly restored to the public domain. This is evident from the various orders issued by the secretary of the interior and the land commissioner, for in each the rights of persons entitled to consideration, either as settlers under the homestead act, or purchasers under the 1887 statute, were expressly reserved to them. Lands were excepted from the operation of those orders, from those directing a revocation and restoration, and from that of the land commissioner of date October 23, 1896, which seems to have been the final one. As to the selected lands, the final order was express and explicit. It was recited therein that a large portion of the withdrawn and selected lands had been applied for by persons claiming under the settlement laws, and also by Ireland,

claiming under the act of 1887 as a purchaser from the railway company, and the recital was followed by this unmistakable language:

"No disposal will be made of these lands until the above claims are adjudicated by this office. So advise the parties in interest."

There was no restoration of the land in controversy by this order. It was expressly excepted and reserved for an adjudication of the conflicting claims asserted by Ireland and defendant.

The settled law in the federal courts is that, so long as an executive withdrawal of public lands continues in force, the lands covered thereby are not subject to entry, and no lawful settlement on them can be acquired. Wolsey v. Chapman, 101 U. S. 755, 768; Bohall v. Dilla, 114 U. S. 47, 5 Sup. Ct. 782; Bullard v. Des Moines R. Co., 122 U. S. 167, 7 Sup. Ct. 1149; Spencer v. McDougal, 159 U. S. 62, 15 Sup. Ct. 1026; Northern Pac. R. Co. v. Smith, 171 U. S. 260, 18 Sup. Ct. 794. This was taken as a settled rule in Sage v. Swenson, 64 Minn. 517, 67 N. W. 544. We cite these cases and Hamblin v. Western Land Co., 147 U. S. 531, 13 Sup. Ct. 353, on the point that, although plaintiff must recover upon the strength of his own title, the defendant, under the authorities, is not in a position to question the conveyance of the legal title by the government by its patent. See, to the same effect, Minnesota Land & Inv. Co. v. Davis, 40 Minn. 455, 42 N. W. 299; Winona & St. P. Land Co. v. Ebilcisor, 52 Minn. 312, 54 N. W. 91; Lamprey v. Mead, 54 Minn. 290, 55 N. W. 1132.

An act of congress of 1890 (26 Stat. 496) repealed, as before stated, section 7 of the original grant, by which section it was made the duty of the secretary to withdraw the lands; and counsel argue that this was a revocation of the executive order, restoring of itself these lands to the public domain. But aside from the fact that, if Ireland's rights accrued at all, they were then irrevocably fastened upon the lands, it is plain that this repeal did not annul or revoke the withdrawal order; nor did it pretend or purport to annul or affect it. The validity of that order did not depend upon section 7, but was valid without and independent of that enactment.

The interior department possesses plenary power to withdraw public lands from settlement and market at will, and when it acts in this regard it is deemed an act of the president. Wolsey v. Chapman, 101 U. S. 755. And it seems to be quite immaterial what may be the reason or basis of the order, or what land it affects. A withdrawal, as part of a land grant, of lands outside and far beyond the limits of the grant, was held effectual and valid in Wolcott v. Des Moines Co., 5 Wall. 681. Again, in Spencer v. McDougal, 159 U. S. 62, 15 Sup. Ct. 1026, it was held that although more land is withdrawn by an executive order than is necessary for the railway grant, which it refers to and is based upon, the withdrawal is valid, even to the extent of defeating the claim of a subsequent pre-emptor. The withdrawal of lands from the public domain, where no antecedent rights arise under the settlement laws, and the subsequent restoration thereof, is, and of necessity must be, committed to the discretion of the officials of the interior department. And it has been the uniform ruling of that department, when construing the law now before us, that "the right of one who purchases land from a railroad company prior to the passage of the act of March 3, 1887, to perfect title under section 5 of said act, is superior to the settlement right of another, acquired after the passage of said act." Skinvik v. Longstreet, 22 Land Dec. Dep. Int. 32.

Under the authorities before cited, it might safely be held that, as defendant could not acquire and did not have any interest in this land, the facts which he alleged in his answer and established on the trial are of no avail to him, because the patent—not void, but, at most, simply voidable—has been issued to Ireland by the United States, and the latter alone can question its validity. But plaintiff's right to recover is not dependent exclusively upon this rule of law, in our opinion.

2. The next question for discussion is whether Ireland was a bona fide purchaser of the land, within the intent and meaning of the fifth section of the act of 1887.

It must not be forgotten that this provision of the law was not passed for the purpose of aiding or relieving persons who subsequently entered into contracts with railroad companies, but was

solely for the benefit of those who had in good faith purchased prior to the enactment, and who might be grievously wronged if no relief was afforded them. No contract entered into after the passage of the law was to be affected by it. All within its scope were past transactions, in which there had been purchases in an honest belief that title would be perfected in the future by means of existing land grants.

Ireland's 1883 agreement was entered into four years prior to the passage of this law, which had for its object a remedy for good-faith purchasers, where, for some reason, the railway companies with which they had dealt failed to obtain title, and the equities of the purchasers were so great as to call for legislative interposition. It was therefore proper for the officers of the land department to construe section 5 liberally, with a design to effectuate its object. A strict construction would destroy the intent and contravene its purpose, adding to, instead of diminishing, the injury inflicted by rulings adverse to the companies as to land grants. The department officials so held, following the universal practice in all cases where construing remedial statutes, and gave to section 5 a liberal construction, that its real object might be subserved and promoted.

The extent to which the department has gone to sustain claims asserted under this statute will be seen upon examination of many cases which have been decided. In that of In re Campbell, 12 Land Dec. Dep. Int. 247, the contract under consideration, made between Campbell and the railway company, contained full information as to the status of the land, and of the doubt as to the railway company acquiring title. The latter merely agreed that if it obtained title it would sell to Campbell for a certain price, giving its present consent that he might settle upon the land. He was to pay no part of the agreed price until the company could convey a good title, nor was he bound to accept a deed. As to him the contract was nothing but a permit to occupy, and a conditional option to buy. The only real distinction between that case and the one at bar is that Campbell personally entered upon the land covered by the agreement, occupied the same, and made valuable improvements. From the decision it is evident that the

occupation and improvements were merely regarded as evidence of Campbell's bona fides. They tended to establish his good faith, and were not considered as of any greater evidentiary value, for the statute nowhere requires occupation or improvements by the purchaser. Citizenship, or a declaration of intention, and a bona fide purchaser, are the only essentials, so that occupation and improvements are of no consequence except as they strongly establish honesty of purpose in the purchaser. The railway company failed to secure title to the Campbell land, and he was then allowed to purchase from the government, under section 5.

Many other cases of like character might be referred to. One is Austin v. Luey, 21 Land Dec. Dep. Int. 507. Mrs. Austin was permitted to purchase under this law, although she took possession of the land without an agreement in writing, and with a verbal understanding that the company could not then sell or agree to sell, and could not take any money from her until it obtained title. It was held immaterial as to how the contract was evidenced, and, further, that the terms "purchase" and "sale," as found in the law, are not to be understood in their technical and limited significatiou, but, rather, in their widest and most comprehensive meaning. In Grandin v. La Bar, 23 Land Dec. Dep. Int. 301, the secretary said that the object of the law was to protect all persons who had parted with a valuable consideration, whether in money or other property, in consideration of the transfer of lands for which a company could not and did not pass valid title. There the consideration paid was preferred stock in defendant company, which, it was contended, had been issued without legal authority, and had no market value. Upon this point the secretary said: "It is charged that the stock had no market value, but that fact, if true, does not affect the question" of consideration.

In the present case Ireland had placed a large number of settlers on lands belonging to the company, and made them patrons of its road, under his 1881 agreement; and he continued to do this under the agreement of 1883. A settlement of the country was for the benefit of the company in many ways, and undoubtedly this fact entered into, and actually was part of, the consideration for the agreement. The services rendered and the labor performed by

him in inducing settlement of a new region were part of this consideration; and, should he be denied the benefits of the act of 1887, these services and this labor would go wholly unrewarded,— a most inequitable result. As showing the liberality with which section 5 has been construed by the courts, attention is called to U. S. v. Southern Pac. R. Co. (C. C.) 88 Fed. 832, wherein it was held that where an applicant under the act possessing the requisite qualifications as to citizenship, and was a bona fide purchaser from one who had bought from a company, it was of no consequence that the original purchaser was not a citizen, and had not even declared his intention to become such.

In the exhaustive opinion of the land commissioner written in this case, which opinion was approved by the secretary, the very liberal views previously adopted in construing the act were referred to and applied; and it was said that the railroad company recognized Ireland's good faith in purchasing, and so did the purchasers holding contracts with and under him, and this was evidence of the bona fides of his purchase. It was held that, as Ireland has expended time and means in settling and selling the lands, he would suffer great loss should he fail to secure relief, and, as the whole scope of the law was remedial, it should be applied, because he and persons dealing with him had acquired equities which in justice ought to be recognized, and that it was the intention of congress to afford relief even where the evidence showed no more than an agreement of purchase by a bona fide purchaser, evidenced by such consideration as would show good faith. The commissioner also referred to the fact that defendant's homestead claim was based upon a settlement in 1891, years after Ireland's contract was made, and after the passage of the act of 1887; and, as before stated, it was decided that the latter was a bona fide purchaser, within the spirit and intent of the law.

The decision was in accordance with many previously made by the department in which this term "bona fide purchaser," as used in the statute, had been construed, and it was nothing but an application of the opinion of the attorney general (6 Land Dec. Dep. Int. 275), wherein he said: "The whole scope of the law from the second to the sixth section, inclusive, is remedial. Its intent

is to relieve from loss settlers and bona fide purchasers who, through the erroneous or wrongful disposition of the lands in the grants, by the officers of the government, or by the railroads, have lost their rights or acquired equities which in justice should be recognized." For years this had been the rule in the department when construing this statute. Where there has been a long and uniform course of construction of a statute in a tribunal charged with the duty of executing it, such construction is always entitled to the most respectful consideration by the courts, and ought not to be overruled without cogent reasons. This was said in U. S. v. Moore, 95 U. S. 760, and we quite agree.

It is contended by counsel for defendant that, as the 1883 agreement of the company was not one which could have been enforced by either party, it should not be recognized. But in the opinion of the officers charged with interpreting the law, enforceability of the contract is not the proper test. We are of the same opinion, for, with such a test, strict construction of the law would be the rule, not the liberal construction which has always prevailed. The expression "bona fide purchaser" is oftentimes used ambiguously, and is construed in various ways. We look to the context, and consider the term with reference to its use and the connection in which it is found. It may mean without fraud or deception. It may mean without notice of another's rights. It sometimes signifies honesty of purpose as distinguished from bad faith. To be a bona fide purchaser may, under some circumstances, require the payment of the consideration or purchase price, but not always. In U. S. v. Winona & St. P. R. Co., 165 U. S. 463, 481, 17 Sup. Ct. 368, when construing section 5, it was said:

"Congress attempted to protect an honest transaction between a purchaser and a railroad company, even in the absence of a certification or patent." And, further, that the act "must be held to include one who, if not in the fullest sense a 'bona fide purchaser,' has nevertheless purchased in good faith from the railroad company."

Again, in another case in the same volume, Winona & St. P. R. Co. v. U. S., 165 U. S. 483, 17 Sup. Ct. 381, the court said:

"It is essential to the protection of these statutes that the party

purchasing from the railroad company has no notice by any fact subsequent to and independent of the certification or patent of any defect in title. Such a purchaser cannot claim to be one in good faith if he has notice of facts outside the records of the land department disclosing a prior right. The protection goes only to matters anterior to the certification and patent. The statute was not intended to cut off the rights of parties continuing after the certification, and of which at the time of his purchase the purchaser had notice. Only the purely technical claims of the government were waived."

Here it was held that a purchaser with notice could not claim to be one in good faith, and that really ought not to have been questioned. In this statute, we apprehend, the expression "bona fide" is used as the opposite of "mala fide," and it is impossible to point out wherein Ireland acted in bad faith in the entire transaction, or wherein he failed to act in the best of faith, and with intent to carry out and complete the purchase by paying the money. We are of the opinion that, as a matter of fact, he was a "bona fide purchaser," within the meaning of the law; and this view must also lead to an affirmance of the judgment appealed from. But there is another, and principal, question in the case.

3. The land department determined that Ireland was a bona fide purchaser, and, if this question was one of fact, its determination is conclusive upon all courts. The question of good faith enters into the qualifications of all settlers under the homestead act, as it formerly did into all cases arising under the repealed pre-emption law. This question has always been regarded by the department as one of fact, purely; but, even if we should concede that the question of good faith is one of mixed law and fact, the decision of the officials of the land department must be held equally as conclusive as to the fact involved. While it may be exceedingly difficult to draw the line, and distinguish between pure questions of fact and those of mixed law and fact, the facts in either case are to be determined in the land department as questions of fact alone. The difficulty of distinguishing to which we have referred emphasizes the necessity of such a rule.

It is well settled that authority to hear and determine all ques-

tions of fact arising in the land department of the general government is exclusively vested in the appropriate officers thereof. The jurisdiction thus conferred is judicial in its nature, and the decisions of the department officers, when acting within their jurisdiction, are final and conclusive, and cannot be reviewed by any other branch of the government, when unaffected by fraud or mistake. This rule was first adopted in Wilcox v. Jackson, 13 Pet. 498, 511. It has been followed repeatedly since that time. Said Justice Miller in Moore v. Robbins, 96 U. S. 530, 535: When land officers decide controverted questions of 'fact, their decision is final, in the absence of fraud or imposition or mistake, except as they may be reversed on appeal in that department. Under the rules of the department (In re Campbell, 8 Land Dec. Dep. Int. 27), and its decisions, an applicant under the fifth section of the law of 1887 is a special pre-emptioner, and therefore to be treated the same as any other pre-emptioner, except that he must have the added qualification of being a bona fide purchaser from a railway company before the latter's claims or rights were canceled. Therefore all matters relating to the applicant's status as a purchaser in good faith from the company, as well as his citizenship, are matters which constitute his qualifications or competency as such special pre-emptioner. We have held that the competency of a party to comply with the requirements of the pre-emption act— his qualification as a pre-emptioner—is a question of fact, peculiarly for the determination of the officers of the land department, and the decision of these officers "is conclusive on a question of fact in the absence of fraud." Bishop Iron Co. v. Hyde, 66 Minn. 24, 68 N. W. 95.

No valid distinction between a determination as to the competency or qualifications of the ordinary pre-emptor and the applicant, Ireland, can be suggested. That the latter possessed the requisite qualifications under the 1887 act was peculiarly for the determination of the officers of the land department, and by such officers has been disposed of in his favor. Whether a purchaser is a bona fide purchaser is a question of fact. Green v. Humphry, 50 Pa. 212. See also as to the nature of the question of bona fides, and the conclusiveness of a department decision: Jeffords v. Hine

85 M.—32

(Ariz.) 11 Pac. 351; Vance v. Burbank, 101 U. S. 514; Quinby v. Conlan, 104 U. S. 420; Carr v. Fife, 156 U. S. 494, 15 Sup. Ct. 427; Catholic Bishop of Nesqually v. Gibbon, 158 U. S. 155,. 15 Sup. Ct. 779. As before stated, the question of Ireland's bona fides was one of fact, or possibly a question of mixed law and fact. In either case the determination of the land department cannot be reviewed in this court. We are obliged, under the decisions, to abide by it.

Order affirmed.