No. 19,661.

THE CITY OF JUNCTION CITY, *Appellee and Appellant*, v. THE CENTRAL NATIONAL BANK OF JUNCTION CITY, *Appellant and Appellee*.

SYLLABUS BY THE COURT.

1. PAVING BONDS—*Contract with Bidder to Purchase—Interpretation of Contract.* Where a city offers to sell its municipal bonds "subject to the legality of the issue," and a bank makes a bid thereon, "subject to approval as to legality," both qualifying phrases have the same meaning, and where the city accepts such bid, and the bank repudiates the contract, the legality of the issue becomes a judicial question.

2. SAME — *Statutory Limit of City Indebtedness — Paving Bonds Excluded.* Chapter 109 of the Laws of 1911, in fixing a maximum limitation of bonded indebtedness which may be incurred by a city of the second class, specifically excludes paving bonds from that limitation.

3. SAME—*Repudiation of Contract by Bidder—No Restitution of Earnest Money.* Contract for the purchase of $50,000 worth of bonds examined, and held that the bidder which repudiated its contract of purchase is not entitled to restitution of $1000 which accompanied its accepted bid.

4. SAME—*National Bank May Purchase Municipal Bonds.* It is not beyond the corporate powers of a national bank to make a valid contract for the purchase of municipal bonds.

5. SAME—*Repudiation of Purchase by Bidder—City May Recover Damages.* Where a city offers its paving bonds for sale and the successful and accepted bidder repudiates its contract of purchase, the city may recover from such bidder compensatory damages, even if these exceed the sum which the bidder puts up as a pledge of good faith accompanying the bid.

Appeal from Geary district court; Roswell L. King, judge. Opinion filed October 9, 1915. Reversed in part and judgment ordered for plaintiff.

W. S. Roark, of Junction City, for the Central National Bank.

I. M. Platt, and James V. Humphrey, both of Junction City, for Junction City.

The opinion of the court was delivered by

Dawson, J.: In May, 1913, Junction City desired to sell certain bonds in the sum of $50,560 to raise funds for street paving. To that end it requested a bid from the Central National Bank of the same town. The city's communication to the bank contained the following:

"All bids to be made subject to the legality of the issue. A certified check for $1000 is required to accompany bid."

Seven days later the bank answered:

"In response to your favor of the 9th inst. I desire to make the following bid for the bonds referred to by you, viz., $50,000 serial improvement bonds, bearing 5 per cent semi-annual interest subject to approval as to legality, you to furnish the bonds. We will accept and pay for said bonds when duly registered and ready for delivery, par and accrued interest and $75.00 premium.          CENTRAL NATIONAL BANK,
                                                    By S. W. Pierce, President."

The following day, May 17, the city commissioners met and accepted the offer of the bank.

Four days later, May 21, the bank wrote:

"We desire to state that we wish the bonds which we purchased last week to be issued in denominations of $500.00 each, instead of $1000.00, and we will pay the additional costs for registering and printing same.

"We wish you would kindly furnish full transcript of all proceedings relating to this issue of bonds as soon as possible."

In due time the bonds were executed, offered to and declined by the school-fund commission—a statutory prerequisite (Gen. Stat. 1909, § 8950), and on approval by the attorney-general were registered by the auditor of state. With these matters disposed of, the city tendered the bonds to the defendant bank on July 29, 1913, whereupon they were declined by the bank.

The same day the bank addressed two letters to the city officials, as follows:

"GENTLEMEN: Referring to the issue of city bonds for the paving of North Washington street amounting to $50,560.00, which we purchased from you 'subject to legality,' we beg to inform you that the transcript of the proceedings relating to the issuing of these bonds furnished us by your city clerk was duly submitted to McCune, Harding, Brown and Murphy, attorneys, 831 Scarret building, Kansas City, Mo., for examination and opinion as to the legality of said bonds.

"The firm referred to decline to approve the legality of the bonds and the proceedings were then forwarded to Hon. Chas. Wood of Chicago for examination and without any information as to the opinion of said firm and without prejudice. After waiting two weeks for this opinion we are informed that it is the same as Judge McCune's, which is, that these bonds are in excess of the debt limit authorized by our statutes and therefore illegal.

"Under these circumstances you can not expect us to accept and pay for the bonds, and we would ask you to return to us the certified check submitted with our bid, and oblige."

"GENTLEMEN: Whereas, Judge Henry L. McCune, of the firm of McCune, Harding, Brown and Murphy, Attorneys, Kansas City, Mo., and Judge Chas. B. Wood of Chicago have carefully examined the proceedings relating to the issue of the bonds for the paving of North Washington Street in this city to the amount of $50,560.00, and whereas both of these gentlemen express their opinion that in issuing these bonds, this city exceeds the limit of its authority to issue these bonds, and therefore said bonds are not legal. In view of the foregoing facts, we must decline to accept and pay for said bonds until such time as you have established in a court of competent jurisdiction that said bonds are legal beyond any doubt."

Thereupon the plaintiff city sought a market elsewhere for its bonds, and as the bond market was down it had to sell them at a discount, and incurred certain expenses in so doing. This discount, expenses, etc., amounted to $1630.55, and after appropriating the proceeds of the bank's certified check for $1000, the city brought this action to recover the balance, $630.55.

The bank filed a general demurrer to the plaintiff's petition. This was overruled. The bank then filed an answer in which it pleaded that as a national bank chartered under federal statutes it did not have authority to purchase the bonds; and (third) that the bonds were illegally issued because they exceeded the limit of indebtedness authorized by state statutes; that the bank's contract of purchase was "subject to approval

as to legality"; and (fourth) that "defendant, upon plaintiff's offer to deliver to it the aforesaid bonds, and in order that it might exercise an intelligent and prudent judgment and election under the aforesaid terms of its said bid as to the acceptance of the said bonds, submitted the subject of their legality to lawyers of high repute, skill and experience in the examination and the determination of the validity of such bonds, and were by such attorneys advised that said bonds were invalid and void for the reasons set forth in the third defense herein. Also alleged the good faith on the part of the attorneys in their examination and advice relative to the validity of said bonds and that it acted honestly and in good faith upon the aforesaid judgment and advice of said attorneys, and so doing, and so believing and relying thereon, elected to and did disapprove said bonds as to their legality, and thereupon refused to accept them. That thereupon it promptly and in good faith notified plaintiff," etc.

Other allegations covered good faith and mistake on the part of the bank as to its corporate powers, and concluded with a prayer for the restitution of the $1000 which had accompanied its original bid.

A demurrer was sustained to the third defense; and on motion of plaintiff the fourth defense was stricken out on the ground that it was essentially the same as that of the third defense to which a demurrer had been sustained.

The district court made findings of fact and conclusions of law, the latter being as follows:

### "CONCLUSIONS OF LAW.

"No. 1.   Under the Seventh sub-division of Section 5136 of the U. S. Revised Statutes defining the powers of National Banks, such Banks are not empowered or authorized to purchase or deal in municipal bonds as an investment, and when a National Bank makes a contract to purchase such bonds for such purpose, the contract, so far as is executory or unexecuted, can not be enforced.

"No. 2.   A national Bank has no power or authority to act as agent or broker for another in buying and selling municipal bonds.

"No. 3.   The bonds in question in this case are legal, valid and binding obligations of the city of Junction City, Kansas, and said city did not exceed the limits of its authority in the issuance of the same.

"No. 4.   The plaintiff City is not bound to return the certified check that accompanied the bid in question in this case, and the defendant

Junction City v. Bank.

is not entitled to a judgment against the city for the amount of said check in this action.

"No. 5.    That this action should be dismissed at the costs of the plaintiff."

From this judgment of dismissal both parties appeal.

The bank assigns error: 1. That the court held in effect that the words "subject to approval as to legality" meant a judicial determination of the question. 2. That the bonds were illegal. 3. That the bank should have been given restitution of its $1000. 4. That the contract was *ultra vires*. 5. The city in its cross-appeal assigns error on the refusal of the court to give judgment for the $630.55, being the balance of the city's expenses arising from the bank's breach of contract.

1. Examining these alleged errors, the city's offer read: "All bids to be subject to the, legality of the issue." The bank's bid recited: "Subject to approval as to legality." But it is only fair to say that the general tenor of the bank's letter was a bid for the bonds on the terms and conditions of the city's offer. We can not view this letter of the bank as a counter proposition. The qualifying condition must be held to mean the same in both the offer and the bid. If the issue was valid, the bank was to be bound; if not, the bank was to be relieved. It would not have been difficult for the bank to have made the approval of its attorneys or of any reputable attorney a condition of its bid. It did not do so; and the fair import of its bid does not warrant the interpretation which it afterwards sought to place on it when the bond market had slumped. Counsel for the defendant call our attention to the case of *City of Great Falls v. Theis,* 79 Fed. 943, and some others to the same effect, which hold that the purchaser of bonds may be excused from his bargain where his attorneys had advised that the bonds were illegal, even though the issue was afterwards judicially upheld. But we doubt the wisdom of that doctrine, and in any event we decline to apply it here. If the lawyer's doubt was founded upon a serious question touching the legality of this issue we would have a different case. There was no excuse for that doubt in the case at bar so far as now presented to us. Here it was certainly proper to consider the validity of the bonds as a judicial question.

2. The alleged defect in the bonds was that they were issued in excess of the limitations fixed by chapter 109 of the Laws of 1911. That statute provides that the bonded debt of a city of the second class, such as Junction City, shall not exceed one and one-half per cent of the assessed valuation of all taxable property within the city; but it is also provided that bonds for paving improvements and certain other specified purposes shall not be included in such limitation. The bonds in question were for paving, and therefore specifically excluded from the limit of indebtedness which chapter 109 sought to restrict.

3 and 4. Neither did the court err in holding that the bank was not entitled to restitution. It was bound by its contract. The purpose of a certified check to accompany a bid is well known. It was a pledge of good faith, and to guarantee a recoupment or partial recoupment for any contingent loss to the vendor if the contract was broken by the vendee. We can not agree with counsel for appellant nor with the learned trial court in its conclusion that the contract was *ultra vires*. Let it be conceded that the bank had no power to act as broker, or purchase the bonds as agent for another vendee. The city had no notice of the bank's agency. It assumed that it was dealing with the bank as a *bona fide* purchaser. (10 Cyc. 1148.)

What is there to the contention that a national bank may not purchase muncipal bonds? The district court found that under subdivision 7 of section 5136 of the Revised Statutes of the United States, 1873-1874, no such power is conferred. That subdivision reads:

National banks have power—

"Seventh. To exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin and bullion; by loaning money on personal security; and by obtaining, issuing and circulating notes according to the provisions of this title."

Is not the purchase of municipal bonds an incidental power of banking? Are municipal bonds not an evidence of indebtedness which may be discounted? Shall we close our eyes to the

fact that national banks, with the sanction or at least without the disapproval of the federal government, are state depositaries of this commonwealth, and that they do procure municipal bonds and deposit them with the state treasurer to secure state deposits? Shall we ignore the financial and banking statistics of this state and the country at large, which continually show the vast sums invested by national banks in municipal bonds? We are bound to take judicial notice of matters of such great public concern. We could not give countenance even to an intimation that such investments are questionable. Nor does this power to acquire municipal bonds depend wholly upon the general language of the statute referred to.

In section 3 of the act of congress of May 30, 1908 (35 U. S. Stat. at Large, ch. 229, pp. 546, 548, Fed. Stat. Annotated, Supplement, 1909, p. 358), we find specific sanction given to such investments. It reads in part:

"That any national banking association which has circulating notes outstanding secured by the deposit of United States bonds to an amount of not less than forty per centum of its capital stock, and which has a surplus of not less than twenty per centum, may make application to the Comptroller of the Currency for authority to issue additional circulating notes to be secured by the deposit of bonds other than bonds of the United States. . . . The Treasurer of the United States, with the approval of the Secretary of the Treasury, shall accept as security for the additional circulating notes provided for in this section, bonds or other interest-bearing obligations of any State of the United States, or any legally authorized bonds issued by any city, town, county, or other legally constituted municipality or district in the United States which has been in existence for a period of ten years."

5. Holding these views, we think that the city should have judgment for the balance of its expenses which arose from the bank's breach of contract, and this case is remanded with instructions to enter judgment for the city as prayed for in its petition.

It is so ordered.

DAWSON, J. (dissenting): I think that the words "subject to the legality of the issue" as mentioned in the city's offer and the words "subject to approval as to legality" as set forth in the bank's bid should be interpreted according to the custom

of the trade. That custom is so well known as to need no evidence to show it, although it was abundantly shown by the defendant bank. The qualification "subject to legality" or "subject to approval as to legality" does not mean a judicial determination. It means that the contract was conditioned upon the approval of the purchaser's lawyer or bond expert touching the proceedings leading up to and involved in the bond issue, and it means that the examination of the proceedings by the bank's lawyer or expert should be made in good faith, and that to excuse the purchaser from its bargain such examination should show some rational or tangible doubt as to the legality of the issue and not some mere quibble. In this capitol building where this court sits is the largest bond market in Kansas—that of the School Fund Commission; and that body by statute and practice invariably purchases bonds with that same qualification and never otherwise. Bond purchasers no more than real-estate purchasers should be held to their bargains if there is any serious chance of legal infirmities in the matters which are the subject of the contract. It will not tend to expedite either public or private business to lay it down dogmatically that the successful bidder for municipal bonds is bound absolutely, notwithstanding the honest misgivings of his lawyers as to the legality of the issue, when it its afterwards judicially determined that the bond issue is valid. The defendant bank was denied the privilege of making this defense.

The city should have recoupment to the amount of $33 for the reprinting of the bonds at the behest of the bank. For the errors of the trial court on which this court unanimously agrees there should be a new trial; and I would confine it largely to questions pertaining to the bank's good faith in its consultation of attorneys as to the legality of the issue, and whether the legal infirmities pointed out by the bank's attorneys were fair questions of legal debate or mere evasive quibbles. I therefore dissent.

Mr. Justice MARSHALL concurs in this dissent.