BOARD OF TRUSTEES FOR REGINA PUBLIC SCHOOL DIST. NO. 4 OF SASKATCHEWAN v. SPITZER et al.

(District Court, N. D. Ohio, W. D. January 9, 1919.)

No. 2484.

1. SCHOOLS AND SCHOOL DISTRICTS ⬿97(7)—VALIDITY OF BONDS—PROCEEDINGS PRELIMINARY TO ISSUE.

Under a statute requiring trustees of a school district, before issuing bonds, to embody the proposition in a by-law and post notices containing the same in public places, to afford the electors opportunity of demanding a poll, bonds of a district are not invalid because, whereas, the preamble to the by-law recited that they should bear interest at not more than 8 per cent., payable annually, as issued the interest was made payable semiannually, with a rate of 5 per cent., which made the loan more favorable to the district.

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. STATUTES ☞210—CONSTRUCTION—PREAMBLE.

When the enacting portion of a statute or by-law is unambiguous, its meaning will not be controlled or affected by anything in the preamble or recitals.

3. SCHOOLS AND SCHOOL DISTRICTS ☞97(7)—BONDS—SUBSTANTIAL COMPLIANCE WITH STATUTE.

Where school district bonds have been issued in compliance with statutory requirements in every substantial matter, they are not invalidated by immaterial variations, such as the fixing of a particular place of payment, or providing for payment of interest semiannually, instead of annually; things which are not prohibited by the statute, which merely prescribes the annual rate of interest.

4. CONTRACTS ☞328(5)—CHANGING DEFENSES.

Where defendants based their refusal to perform a contract on a specific ground, they cannot, when sued for its breach, shift their defense to other grounds, which, if they had been made known at the time, might have been obviated.

5. SCHOOLS AND SCHOOL DISTRICTS ☞97(5)—BONDS—CONTRACT TO PURCHASE—ACTION FOR BREACH.

One contracting to purchase bonds to be issued by a school district, and who by his attorney, before making the contract, carefully examined the statute under which they were to be issued, cannot avoid the contract because of a fact claimed to render them less desirable than he supposed, but which was plainly disclosed by the statute.

6. SCHOOLS AND SCHOOL DISTRICTS ☞97(5)—CONTRACT FOR SALE OF BONDS—VALIDITY.

A contract by a school district for the sale of bonds to be issued by it is not invalid, because the bonds are not then in existence, where the district has taken all the steps required by statute to authorize their issue.

7. SCHOOLS AND SCHOOL DISTRICTS ☞97(5)—CONTRACT FOR PURCHASE OF BONDS—VALIDITY.

A contract for the purchase of bonds of a school district, subject to approval of the proceedings leading to their issuance by purchasers' attorneys, cannot be avoided on the ground that such approval was not given, where, after receiving a transcript of all such proceedings, with time for its examination, and without objection thereto, purchasers prepared the bonds and sent them to the district for execution.

8. SCHOOLS AND SCHOOL DISTRICTS ☞58—VALIDITY OF CORPORATE ENACTMENT—NECESSITY OF SEAL.

Under the common law, acts of the trustees of a school district, who are made by statute a corporate body with a seal, passed at a regularly constituted meeting and made of record, need not be sealed.

9. SCHOOLS AND SCHOOL DISTRICTS ☞97(5)—SALE OF BONDS—VALIDITY OF CONTRACTS—ULTRA VIRES PROVISION.

A provision in a contract by a Canadian school district for sale of its bonds, to be issued, that they should be made payable in money of the United States, held, while ultra vires, since the statute only authorized the issuance of bonds payable in Canadian or English money, a separable provision, which did not invalidate the contract as a whole, especially where it was so treated by the parties, by abandoning such provision and making the bonds conform to the statute.

10. SCHOOLS AND SCHOOL DISTRICTS ☞97(5)—SALE OF BONDS—ULTRA VIRES CONTRACTS—EFFECT OF PART PERFORMANCE.

Where a school district, after making a contract for the sale of its bonds, on the faith of the contract and in carrying it out, incurred a considerable expense and entered into lawful contracts for the purchase of property, to be paid for from the proceeds of the bonds, the purchasers could not afterward avoid their obligation to take the bonds, on the ground that the contract contained provisions which on the part of the district were ultra vires.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

11. SCHOOLS AND SCHOOL DISTRICTS ⊚═97(10)—VALIDITY OF BONDS—"BONA FIDE HOLDERS."

Under a statute of Saskatchewan, Canada, requiring the proceedings of a school district for the issuance of debentures to be submitted to the minister of education, and providing that on his approval the validity of the debentures, when executed and presented to and countersigned by him, should not be questioned in any court of the province in the hands of a bona fide holder, such "bona fide holder" includes any purchaser from the district for value and without actual fraud.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Bona Fide Holder.]

12. SCHOOLS AND SCHOOL DISTRICTS ⊚═97(5)—CONTRACT FOR SALE OF BONDS —DAMAGES FOR BREACH.

An accepted offer to purchase bonds of a school district, made in response to a public advertisement for tenders, does not create a contract merely for the loan of money, but is one for the sale and purchase of negotiable public securities, for the breach of which by the purchaser compensatory damages are recoverable.

At Law. Action by the Board of Trustees for Regina Public School District No. 4 of Saskatchewan against Adelbert L. Spitzer, Horton C. Rorick, and Carl B. Spitzer, doing business as Spitzer, Rorick & Co. Trial to the court, and judgment for plaintiff.

Marshall & Fraser, of Toledo, Ohio, and Brown, Thom, McMorran, Bastedo & Jackson, of Regina, Sask. (D. J. Thom, of Regina, Sask., of counsel), for plaintiff.

Tracy, Chapman & Welles and James S. Martin, all of Toledo, Ohio, for defendants.

KILLITS, District Judge. The defendant, a copartnership known as Spitzer, Rorick & Co., of Toledo, Ohio, dealing in municipal and other securities, entered into an agreement in April, 1913, with the plaintiff, the board of trustees for the Regina public school district No. 4, province of Saskatchewan, Canada, to purchase at the rate of 95 per cent., or for $475,000, $500,000, par value, of debentures which the plaintiff proposed to issue. These debentures were to be dated May 1, 1913, to run for 20 years, and were to be issued pursuant to the school laws as found in chapter 100 of the revision in 1909 of the laws of the province, with subsequent amendments. In citing these laws by section number hereafter, it will be understood that the numbering is that of chapter 100 of this revision. After making the agreement in question, the board proceeded to the execution of the debentures, which, as to the last $400,000, were declined by defendant for reasons hereafter discussed; the first installment, of $100,000, being accepted at the contract rate of 95 per cent. ($95,000), the defendant reserving its objection to taking the rest. Defendant finally declining to take the balance, after some delay plaintiff sold them at the rate of 90 per cent., and this action is to recover the difference between the offer of defendant of 95 per cent. of par and the price at which they were sold to third parties, or $20,000, as damages for defendant's default. A jury has been waived, there being little dispute as to the facts, and the case is tried to the court upon the facts and law. The

⊚═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

defense raises the question of the validity of the issue and the regularity of the proceedings by the plaintiff board preliminary to issue, principally on grounds raised for the first time in the answer. The case requires an interpretation of certain of the school laws of Saskatchewan as to which we are not materially assisted by local adjudications.

By section 82 of the laws in question:

"The trustees of every district shall be a corporation under the name 'The Board of Trustees for the ——— School District No. ——— of Saskatchewan.'"

It is provided elsewhere that the board shall consist of five members, a majority of which shall constitute a quorum, and section 88 avoids as invalid and unbinding on any party an act not adopted at a regular or special meeting with a quorum present. Section 92 provides for organization, the keeping of records, to be signed by the chairman and secretary, and for other details of control and management, including an obligation to provide and maintain adequate school property and facilities. By paragraph 2 of this section the procuring of a corporate seal is made obligatory, and by paragraph 3 is directed the prompt transmission of reports and statements respecting the board's transactions, as elsewhere required by the act to be given the provincial minister of education.

Other provisions of the chapter determine that the districts may be rural, village or town; that they shall have territorial extent, which in case of a municipality may be coterminous or otherwise with the limits thereof. By section 41 it is provided that, where a public school district has already been organized, a minority of the ratepayers therein, of whatever religious faith, Protestant or Roman Catholic, may demand and secure the erection in the same territory of a separate school district, and that in such case the ratepayers establishing such separate district "shall be liable only to assessments of such rates as they impose upon themselves in respect thereof"; and by section 45, thereafter the board of such separate district shall have the same privileges, obligations, duties, and responsibilities respecting the same as devolve upon the board of the public district. Both districts are municipal corporations of the same quality, called "public" or "separate" by way of designation only, and it is clearly provided in paragraph 2 of section 45 that no one who is legally assessed or assessable for a public school shall be liable to assessment for any separate school, nor shall "the ratepayers of the religious faith of the minority" supporting a separate district be assessable for school purposes other than for his own district.

By section 106 it is directed that the board of any district, desiring to borrow money "upon the security of the district for securing, purchasing, adding to, extending or improving a school site or sites," etc., shall pass a by-law to that effect, to be substantially in the form prescribed by the minister of education, this by-law to be "under the corporate seal of the district," and to be inscribed in the minute book containing the board's record of proceedings.

Section 107 requires that, within five days from the passing of the

by-law, a notice of the board's intention to apply to the minister of education for authority to borrow shall be given to the community in a form prescribed by the minister, and by posting at a post office situated therein and in at least four widely separated and conspicuous places elsewhere therein; and by section 108, if the amount exceeds $800, 20 ratepayers in a town district, acting within 15 days of the date of the posting of the notice in question, may demand a poll for and against the by-law.

It is provided by section 109 that, in case no poll is demanded, there shall be transmitted to the minister a certified copy of the by-law and of the notice provided by section 107, with proof of the posting thereof, and a statutory declaration stating the amount of the assessed value of the real property in the district as shown by the last revised assessment roll in a case of a town district. Paragraph 3 of this section 109 continues as follows:

"And upon receipt of the same and upon being satisfied that the several conditions required by this act have been substantially complied with the minister may in writing authorize the board of trustees to borrow the sum or sums of money mentioned in the by-law or a less sum and shall publish notice of authorization in the Saskatchewan Gazette."

Paragraph 1 of section 127, after a preliminary which does not apply in the instant case, reads as follows:

"Upon being satisfied that the several conditions required by this act have been complied with the minister may in writing authorize the board of trustees to borrow the sum or sums of money mentioned in the by-law and shall publish notice of authorization in the Saskatchewan Gazette. The board may thereupon issue a debenture or debentures to secure the amount of the principal and interest of the loan so authorized or of any less sum upon the terms specified in the by-law and the debenture or debentures and the coupons thereto shall when signed by the chairman and treasurer of the district and countersigned by the minister as provided in section 129 hereof be sufficient to bind the district and create a charge or lien against all school property or rates in the district."

Subsequent paragraphs of this same section limit the amount of the issue to one-tenth "of the total assessed value of the real property within such district as shown by the last revised assessment roll," and provide that the debentures shall be in either of three alternative forms. If form 3 is followed, it is provided that annually by assessment a sum for a sinking fund should be raised sufficient, when compounded at 4 per cent., to meet the indebtedness at maturity.

Section 128 directs that, when the securities are executed by the local board, they shall be sent before issue to the minister for registration. All preliminaries to issue are concluded by the observance of the provisions of section 129, which we quote in full as follows:

"The minister shall thereupon if satisfied that the requirements of this act have been substantially complied with and if the authority to make the loan has not been withdrawn register and countersign the debenture and such countersigning by the minister shall be conclusive evidence that the district has been legally constituted and that all the formalities in respect to such loan and the issue of such debenture have been complied with and the legality of the issue of such debenture shall be thereby conclusively established and its validity shall not be questionable by any court in Saskatchewan

but the same shall to the extent of the revenues of the district issuing the same be of good and indefeasible security in the hands of any bona fide holder thereof."

The Saskatchewan Gazette is an official publication. The school district here under consideration has boundaries identical with those of the city of Regina. Some years before the events giving rise to this action, a separate or Roman Catholic district had been erected within the same limits under the provisions of sections 41 to 45, inclusive.

The plaintiff, taking the first step under the statutes, preparatory to the issue of debentures, on February 14, 1913, regularly passed, adopted, and sealed by-law No. 16. By way of preamble was recited the necessity that the sum of $500,000 should be borrowed on the security of the district for the purpose of erecting certain new school buildings and furnishing and equipping the same, including the purchase of sites, and to improve a school already built. These debentures, as stated in the preamble, were to be "payable to the bearer at the end of twenty years, with interest at not more than 8 per cent. per annum, payable annually." The enacting portion following the preamble reads as follows:

"Now, therefore, the board of trustees of the said district enacts as follows:

"1. That the necessary proceedings be taken under the School Act to obtain the sanction of the minister of education to the said loan.

"2. That if the minister of education shall empower in writing the said board to borrow the said sum pursuant to the said act then debentures of the said district will be issued payable to the bearer at the end of twenty years with interest at not more than 8 per centum per annum and shall be executed by the chairman and treasurer of this board."

Notice of this by-law and its purposes was duly given the public and the proper declarations were made to the minister by whom it was approved, and the proposed issue authorized in writing, publication whereof was duly made in the official Gazette, whereupon the plaintiff advertised for tenders. Early in April, 1913, the defendant sent its representative, Mr. Mann, to Regina to investigate the matter, subsequently notifying the board of his full authority to represent it. Mr. Mann, who is an attorney of this bar, spent about two weeks in and about Regina upon this and other business. In behalf of defendant, April 12, he submitted a proposition in writing that the defendant would pay for $500,000 of plaintiff's 5 per cent. debentures, to be dated May 1, 1913, and to mature May 1, 1933, $475,000, with accrued interest to date of delivery. This proposition stipulated that the debentures were to be in the denomination of $1,000 each, with principal and semiannual interest payable in lawful money of the United States at either of the two branches of the Bank of Montreal at the option of the holders, located in New York City or Toronto, and that defendant would take up $100,000 of the issue August 1, 1913, and the balance in equal installments on the 1st of each of the succeeding four months. The tender concluded as follows:

"We will print and deliver to you at Regina at our expense lithographed blank debentures ready for execution.

"Prior to our taking up and paying for said debentures you are to furnish us complete transcripts of all proceedings leading up to and culminating in

the issuance of said debentures evidencing their legality to the satisfaction of our attorneys. Should our attorneys deem any additional by-law necessary, you are to pass same.

"This offer is for immediate acceptance and time is to be the essence of the contract. We will remit in New York exchange for said debentures."

A majority of the board indorsed their acceptance on this offer, whereupon a notice was regularly given for a special meeting to act formally. At this meeting, April 16, was adopted and duly recorded a resolution in detail accepting the tender following its terms. The resolution was not sealed.

The proposition of defendant embodied terms not within the provisions of by-law 16, whereupon, at the instance of Mr. Mann, representing the defendant, and who directed its substance, a new by-law, given the number 17, was passed at the same meeting. This by-law differed from by-law 16 only in that in the preamble it recited that it was desired to borrow the money with interest payable semiannually, and that in the enacting portion it read that the interest should be payable semiannually and the obligations should be payable "in lawful money of the United States at the Bank of Montreal in the state and city of New York or at the Bank of Montreal in the city of Toronto, Canada, at the option of the holders." Notice of this by-law was not given to the community, but the same was subsequently approved by the minister of education, and formal authority given to the board to issue the debentures therein provided for. Subsequently a transcript of all the proceedings of the board and of the several approvals of the minister of education was sent to defendant in Toledo and acknowledged by the latter's letter of April 22, the first paragraph whereof reads as follows:

"We acknowledge receipt of your esteemed favor of the 17th instant, with inclosures as listed. We will turn same over to our attorneys, and promptly advise you as to the result of their examination."

The attorneys in question appear to have approved the validity of the proposed issue, for defendant proceeded to prepare the blanks. May 21 the latter were forwarded by express, with a long letter of instruction from defendant as to how they should be executed, quoting the advice of defendant's Canadian counsel. It appears from the evidence that the expense incurred by defendant in preparing the blanks was approximately $100, a reprinting having been had as a matter of precaution on the part of defendant, because of the omission of the word "public" in the title of the district, which, it appears, was not regarded as vital by defendant's Canadian counsel. Meanwhile, defendant extensively advertised these securities and negotiated the sale of a substantial part of the first issue about the 1st of July. Receiving the amended blanks, the plaintiff proceeded to execute the debentures, which were countersigned by the minister of education as required by section 129. July 5 the defendant telegraphed instructions for immediate forwarding to its correspondents in New York the first installment of $100,000, which was to be delivered August 1; the defendant having already effected sales. The request for expedition involved plaintiff in the extraordinary expense of sending its secretary

to British Columbia to secure the signature of the minister. The form of the debentures, as finally provided by the defendant, conformed exactly with that prescribed as the third alternative by paragraph 5 of section 127. Each read as follows:

"The Regina Public School District Number 4, of Saskatchewan.

"Under the authority of the School Act and of by-law No. 16, passed on the 14th day of February, 1913, and by-law No. 17 passed on the 16th day of April, 1913, the board of trustees of the said school district promises to pay the bearer the sum of one thousand dollars of lawful money of Canada at the principal office of the Bank of Montreal in the city of Toronto, in Canada, or at its office in the city of New York, state of New York, in the United States, at the holder's option, on the first day of May, 1933, and to pay to the bearer the amount of each of the several interest coupons hereto attached as the same shall respectively become due. Dated May 1, 1913."

Attached thereto were semiannual interest coupons in the exact wording of the third form prescribed therefor in the statute. There was no statute directing or limiting the place of payment.

Defendant first expressed dissatisfaction with its purchase on July 8, when, by wire, it inquired whether lands liable to assessment for debenture indebtedness at the time of incurring the latter remained liable to and subject to assessment for its liquidation until that had been accomplished, or whether the subsequent transfer of lands within the public district at the time of the execution of the debentures to a Catholic owner supporting a separate school would relieve such property of the lien of the indebtedness. By letter of July 22, in which the matter was gone into at length, defendant indicated its intention to decline to take the issue because of its belief that the security was affected on account of the theoretical fluctuation of the amount of real property subject to assessment for the district's purposes, due to the provision for public and separate schools. This letter concludes with the following paragraph:

"While these debentures are not worth as much money as we contracted to pay for them, if it turns out that the security back of them is unfixed and unstable, yet to show our good faith in this matter, and as the district is probably in urgent need of funds, we are willing to take up the $100,000 now in New York pending the further investigation of this matter, if the district desires us to do so, with the express understanding that we are not waiving our rights under the contract, and are not approving the entire issue."

The offer to take the first installment without waiving the objection was accepted by the board. Under date of August 15, the defendant, referring to its letter of July 22, definitely refused to take the balance of the issue, saying, among other things, "Under the circumstances you are at liberty to dispose of the debentures elsewhere." Thereupon the board entered into negotiations with other persons, and sold the issue in September at the rate of 90 cents on the dollar. About this time, but not, however, until after the board had become obligated to sell the issue at 90, defendant made a new proposition to take the remaining $400,000 at 92.

In anticipation of the acquirement of funds through its agreement with the defendant, the plaintiff had entered into contracts and incurred obligations in the purchase of sites and the contracting for

the erection of the school buildings for which the loan was to be effected, a fact which the defendant recognized in its offer to take up the first $100,000, as indicated by the paragraph we have quoted from its letter of July 22. This anticipation of funds seems to have been in accordance with local laws (section 127a).

In this recitation of facts, two things are to be noted:

First, that the only reason given by the defendant, prior to the commencement of this action, for refusing to take the complete issue, is that fully stated in its letter of July 22, and ratified by that of August 15, to wit: Its conclusion that the laws of the province respecting the security by way of lien upon the lands within the school district at the time of issue were less favorable than it thought; and, ·

Second, that the debentures, as finally issued, have behind them a record which is in substantial conformity to the laws of the province.

As this second proposition plays a very important part in the final disposition of this case, it seems proper that there should now be discussed the reasons which lead the court to this conclusion. What we mean by it is this: That every step necessary to authorize the issue in question was substantially taken; that is, the statutory regulations thereto were substantially followed. To recapitulate, these steps are, successively: (a) The passage of a proper by-law which is to be sealed; (b) the opportunity through notice for a poll of the ratepayers; (c) a certified copy of the by-law and of the notice, giving an opportunity to demand a poll, with a declaration stating the amount of the assessed value of the real property of the district, to be transmitted to the minister of education; (d) the approval by the minister of the record so certified to him, followed by his authorization in writing that the loan may be effected, together with a notice of the authorization in the official publication; (e) the preparation and execution of debentures conformably to the form selected from the statute; (f) the second examination of the record made by the board had by the minister of education, followed by a registration of the issue in his office and his countersigning the several debentures.

Every one of these steps was taken in the case of this issue in substantial compliance with the law. By-law 16 was passed and sealed; notice to the community was duly given; the minister was furnished a transcript, with a proof of the notice, and the proper declaration; his authority in writing for the issue was granted—all before the representative of the defendant appeared on the scene. No one contends but that the law was followed exactly, respecting by-law 16, down to the point of execution of the debentures in substantial compliance with its provisions. The intermediate steps thereafter were properly taken as they came, and finally debentures were executed and countersigned by the minister which conformed exactly to the form prescribed by statute which the board of a district such as this may choose under paragraph 5 of section 127. Except for the filling up of the necessary blanks, the form of the debentures in question, as well as that of the coupons attached thereto, is exactly in the wording of the third alternative set of forms for debentures and coupons in the section in question.

[1] Two features of the situation which may be referred to as inconsistent with this conclusion we now discuss. By-law 16 is shown in evidence to have followed substantially the form prescribed by the minister of education whose duty it was to suggest the same. Its preamble recites that there is found a necessity, among other needs, of issuing 20-year debentures "with interest at not more than 8 per cent. per annum, payable annually." Above we have quoted exactly the formal or enacting part of the by-law. Nothing is there said about the time of paying interest. There is nothing in the law which makes it illegal for a board in a district which is coterminous with a town to issue debentures bearing semiannual interest coupons, so that, if it were not for the fact that the preamble to by-law 16 recited that the board found it necessary to issue its securities, which might bear interest as high as 8 per cent. per annum, *payable annually,* there would be no ground at all in this respect for questioning the proceedings.

This leads us to inquire as to the obvious function of the notice to the community after a by-law has been passed. The statute says (section 107) that the notice shall be in the form prescribed by the minister, and shall advertise the intention "to apply to the minister for authority to borrow the amount specified in the by-law and on the conditions therein set forth." Evidently what is required here is that a fair notice should be given to the ratepaying electorate of the fact that it may be burdened with obligations having certain maximum conditions, so that the providence of the proposed issue might be subjected to the review of the underlying responsibility through a poll. Under by-law 16 the community was apprised of a proposition to burden it with debentures which might bear 8 per cent. interest, payable annually. It cannot be said that, having given a notice of this kind, the board was precluded from making better terms for itself than these, and, to that extent only, to vary the noticed conditions; that is to say, no one could be heard to say that, if no poll was demanded on a proposition of this sort, an issue of debentures otherwise conformable to the requirements of the situation and the law, but which provided better terms for the community than 8 per cent. interest payable annually, would be illegal, and it is entirely obvious that the debentures issued at 5 per cent. per annum, with interest payable semiannually, is a much better loan for the community than one at 8 per cent. payable annually. In fact, it is demonstrable that there was a much better bargain effected for the community to sell 20-year 5 per cent. debentures at a 5 per cent. discount, with semiannual interest, than to sell even 6 per cent. debentures at par with annual interest. The last portion of paragraph 3 of section 109 says that the minister may authorize the borrowing of a less sum than the amount stipulated in the by-law, and the obvious purpose of the legislation which twice casts upon the minister (sections 109 and 129) the duty of scrutinizing the board's records and of controlling its final action is to secure as far as possible results most provident and favorable to the district.

[2] But the statute (107) refers the electorate to the by-law for information as to the proposed conditions, and in this case the by-law

itself is silent as to the times of paying the interest, and the rule is well established that, when the enacting portion of a statute or by-law is unambiguous, which is the case here, the meaning thereof will not be controlled or affected by anything in the preamble or recitals. Yazoo & Mississippi Valley Railroad Co. v. Thomas, 132 U. S. 174–188, 10 Sup. Ct. 68, 33 L. Ed. 302.

[3] Secondly, these debentures recite on their face that they are issued pursuant to by-laws 16 and 17; but, as was said by counsel for the defendant, they conform to 17 only in the fact that they carry semiannual interest coupons; otherwise, there is nothing in that ordinance which at all differs from by-law 16, and which, at the same time, has unfavorably affected the terms and conditions of the debentures in any particular. It is true that in by-law 17 first appears the condition that the obligations shall be payable at a branch of the Bank of Montreal, either at Toronto or New York, at the holder's option. But that feature seems to us to be, not only not invidious to the law, but to be a detail not important, either to the by-law or to the notice. It would seem incontrovertible that this detail, as well as that respecting the half-yearly payment of interest, is well within the conclusive determination of the minister, under the provisions of sections 109 and 129, and that the inclusion of neither derogates from the conclusion that "the several conditions" of the act "have been substantially complied with."

Our research has not proceeded far enough to disclose any Canadian or English authorities on the subject, but both matters are included in the decision in Myer v. City of Muscatine, 1 Wall. 391, 17 L. Ed. 564, where Justice Swayne, for the Supreme Court of the United States, holds that no legal principle (in the absence of a specific statute) forbids making a place other than the municipal treasury that where municipal securities are payable, or avoids a contract for the payment of interest at periods less than a year when the statute but specifies a maximum rate per annum. Considering, as we do, that the matter of semiannual interest payments is not inconsistent with the notice given to the electorate under by-law 16, the reference in the debentures to by-law 17 may, we think, be properly set aside as a mere superfluity. Eliminating the provision for an unlawful medium of repayment, this by-law made no substantial change from by-law 16 respecting matters which should be noticed preliminary to exhausting the right to a poll. We therefore conclude that the debentures were issued in substantial conformance with the laws governing such a matter.

[4] Going, now, to the force in this case of the first proposition above stated, we very much doubt whether defenses can be made available which are not set up or suggested until after suit is commenced. The defendant itself recognized that the situation put the plaintiff to a great inconvenience. That was the motive the former gave as the reason for taking the first $100,000, notwithstanding its misgiving as to security, and it seems entirely clear to us that then was the time, and not later, when the defendant should have uttered all its other criticisms, that if they were valid, plaintiff might have had a timely chance to correct conditions. Defendant had all the

knowledge then of facts underlying its additional reasons for its default, which it did not urge until its answer was filed a long while after. Railway Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693; Goodman v. Purnell, 187 Fed. 90, 109 C. C. A. 408; Moore v. Beiseker, 147 Fed. 367, 77 C. C. A. 545; Kansas Union Life Ins. Co. v. Burman, 141 Fed. 835, 73 C. C. A. 69. In the case last cited, Judge Philips epitomizes numerous authorities on the subject, saying (page 842 of 141 Fed., page 76 of 73 C. C. A.):

"It is a wholesome rule of law, instinct with fair play, expressed by Mr. Justice Swayne, in Railway Company v. McCarthy, 96 U. S. (6 Otto) 267, 24 L. Ed. 693: 'Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law.'

"This principle has been applied in the following instances: Davis v. Wakelee, 156 U. S. 690, 15 Sup. Ct. 555, 39 L. Ed. 578, where a bankrupt obtained his discharge, claiming that the judgment against him was not affected by it, it was held he could not, in a subsequent action on the judgment, deny its validity. In Davis, etc., Company v. Dix (C. C.) 64 Fed. 411, where it was held that the purchasers of a creamery repudiating the contract on the ground of fraudulent representations, could not thereafter set up an interpolation in the contract. In Harriman v. Meyer, 45 Ark. 40, where it was held that the defense that a tender was not made in ready money was not admissible where the prior objection was to inadequacy of price. In Wallace v. Minneapolis, etc., Elevator Company, 37 Minn. 465, 35 N. W. 269, where it was held that a bailee refusing to deliver wheat because claimed by another, could not afterwards refuse on the ground that the charges were not paid. In Harris v. Chipman, 9 Utah, 105, 33 Pac. 243, where it was held that a plaintiff rejecting title for want of administrator's bond, could not be heard to object afterwards that letters of administration were not under seal. In Ballou v. Sherwood, 32 Neb. 689, 49 N. W. 796 [50 N. W. 1131], where it was held that title objected to because of pending litigation, the purchaser could not afterwards object for want of seal on the deed. In Frenzer v. Dufrene, 58 Neb. 436, 78 N. W. 720, where it was held that, where a party alleged his wife's recalcitrance as a reason for not executing a contract, he could not afterwards be heard to allege other reasons."

[5] Now, it cannot fairly be argued that, if it were otherwise obligated to take them, the defendant gave in its two letters of July 22 and August 15 a valid excuse for not taking the debentures. That excuse relates itself entirely to the state of the law of the community issuing the securities which defendant was bound to know at all times. Assuming that the law did permit the fluctuation of the amount of real property of the district during the immaturity of these debentures, so that theoretically the security was uncertain and liable to a substantial diminution between date of issue and due date, this was a condition substantially written in the pertinent statutes then in force, and such had been the existing interpretation for a long time. McCarthy v. Town of Regina, 5 N. W. Territory Reports, 74. There is a substantial identity in this particular between the laws of the Northwest Territory and those of Saskatchewan in 1913, as shown by comparison, as well as by reference to the Saskatchewan Act, 4–5 Edward VII, c. 42, the fundamental law on this subject, and upon which the laws in evidence here (Exhibit 3J) are based. To urge the excuse under

consideration was, therefore, but to urge ignorance of the law, which is not an available plea here.

"It is a general and fundamental principle of law that all persons contracting with a municipal corporation must, at their peril, inquire into the power of the corporation or its officers to make the contract." State v. Minnesota Transfer Ry. Co., 80 Minn. 116, 83 N. W. 35, 50 L. R. A. 656.

The statute, which Mr. Mann must have seen (section 127), specifically points out that the proposed debentures would be "a charge or lien against all school property or rates in the district." Research proceeding logically from this language would have led to other sections, which, in application, suggest the result to which defendant referred in its letter of July 22. The harshness of the maxim "Ignorantia legis neminem excusat" has been somewhat modified in equity only, but even there such modification, then resting in discretion, is to be applied only "in the most unquestionable and flagrant cases." Story, Equity Jurisprudence, quoted and approved in Snell v. Insurance Co., 98 U. S. 85, 91, 25 L. Ed. 52.

As, however, the other defenses have been vigorously argued by counsel on both sides, it is deemed not inexpedient to notice them. They are, taking them as they are classified and argued in defendant's brief: (1) The contract is void for want of a corporate seal; (2) it is void because it contemplates an ultra vires act on the part of the plaintiff; (3) there was no authority in the plaintiff to contract, because the debentures were not in existence nor lawfully provided for at the time of contracting; (4) counsel for defendant failed to approve the bonds, such approval being a condition precedent to acceptance; (5) a by-law (17), fundamental to the issue, was invalid, in that notice thereof was not given, that a poll might be demanded; (6) defendant had the right to rescind by reason of misrepresentation of facts by plaintiff. We may dispose of some of these defenses with little discussion.

[6] Thus, we are unable to accord much consideration to the defense 3, that the agreement may be avoided because the subject-matter was not in esse. At the time of the agreement, it was a matter for negotiation to determine what the issue should be as to terms within the maximum conditions of the by-law and the statutes. When Mr. Mann appeared with defendant's tender, plaintiff had regularly passed all the preliminaries to an issue of debentures; it was a matter well within its powers to seek and enter into an agreement for their sale; it was a step consonant with settled business principles, which it could not prudently avoid taking, and at the same time be faithful to the public interests.

No statute of the province instructed the plaintiff board in what manner it should market its securities, wherefore it was at liberty to proceed according to the approved practice, which it in fact did follow. There can be no question but that the negotiation of municipal bonds is a proper subject of contract. In Griffith v. Burden, 35 Iowa, 138, the court (page 143) says of municipal bonds:

"The authority to sell the bonds in the market is an incident attendant upon and growing out of the power to issue them."

This is not a case in which a municipal corporation undertakes to exercise its legislative powers at some future time in a particular way, as defendant's counsel argue. When the agreement of April 12–16 was concluded, all the legislation (by-law 16) essential to the proposed issue had been had, notice for poll had been given, authority to issue was granted, advertisement for tenders was had, and several competitive bids were on hand, including defendant's; there remained for the board but to accept the best tender and to execute the power it then possessed. Thereafter, as to it, administration only was the line of action. It is entirely clear that if a municipal body, at this stage, lacks competency to contract for the sale of its proposed issue, but must first get it into physical existence, the market therefor might be narrowed, to the detriment of the best sale. In this case defendant reserved the right to determine the physical characteristics of the issue, evidently according to that privilege an element of value. This question seems not to have troubled the Chief Justice of the province in trying, at about the time the parties here were dealing with each other, the Case of Tanner, considered infra.

[7] Defense 4, we think, is not well taken, when we compare the statement of the defense with the reservation the defendant made of its right to depend upon the opinion of its attorneys. That reservation, again quoting it, was as follows:

"Prior to our taking up and paying for said debentures, you are to furnish us complete transcripts of all proceedings leading up to and culminating in the issuance of said debentures, evidencing their legality to the satisfaction of our attorneys. Should our attorneys deem any additional by-law necessary, you are to pass same."

The evidence shows that plaintiff did everything required of it under this provision of defendant's proposal. That called for action by defendant's attorney after, and as a result of, examination of the transcripts of all the proceedings affecting the issue; and it is further limited in its effect by the provision that plaintiff should perfect its record of proceedings by the passing of any additional by-law deemed by defendant's attorneys to be necessary. The correlative of this provision clearly is that counsel for the defendant, after being afforded a scrutiny of the proceedings already had, should be diligent in suggesting necessary corrections and additions; otherwise, refusal to approve after plaintiff had adopted defendant's suggestions, and after conditions had been reached which were existent when this issue was rejected by defendant, ought not to be respected. We deem it clear that this provision in defendant's proposal should be construed as intended to further the issue of the debentures and the interests of both parties therein, and not to afford the defendant a final loophole of escape from its obligation after plaintiff had met all of its demands.

But we may go farther than this. We find in this record an approval of this issue by the defendant under this very reservation. When, July 22, was first voiced a dissatisfaction with the agreement, culminating in a rejection of the issue three weeks later, defendant knew, and had known for three months, everything which is now said to affect the validity of the issue. Indeed, with the single exception of the fail-

ure to notice by-law 17 for a poll, all the matters now alleged as affecting invalidity were taken by the board at defendant's instance, or happened under its supervising. With the transcripts of all the proceedings of the board before it, and having submitted the same to the scrutiny of its counsel, defendant itself prepared the debentures, and sent them to plaintiff for execution, without a word of criticism respecting the state of the record. In its letter of April 22, acknowledging receipt of transcripts of proceedings, defendant said:

"We will turn same over to our attorneys and promptly advise you as to the result of their examination."

The sending of the blanks for execution, and at the same time offering no criticism of the record, was tantamount to an approval, and opportunity thereafter to disapprove on grounds then in evidence became exhausted. It cannot be that the right to reject remained should defendant repent its tender. The cases cited by the defense (U. S. Trust Co. v. Guthrie Center [Iowa] 165 N. W. 188; Thurman v. City of Omaha, 64 Neb. 490, 90 N. W. 253) are not in point, because of the active participation, in the instant case, of defendant in the production of the debentures. In the Iowa case, supra, a very late decision, in which authorities are extensively reviewed, it is held that the refusal must be reasonable, even if on mistaken grounds—its good faith obvious. We know of no authority to the point that such a reservation as this is effectively used, when its exercise is attempted on the ground that the party's own handiwork in the result has produced theoretical defects.

Defense numbered above 5 has already been fully considered in our conclusion that by-law 17 was mere surplusage.

Defense No. 6, has, in our judgment, but a color of strength. If there had, indeed, been a substantial misrepresentation of fact, such a defense, of course, would be subject to serious consideration, if made at the right time. Here, however, we are unable to find any such misrepresentation, and we do this without determining the issue of veracity between Mr. Mann, the representative of the defendant, on the one side, and the several officers and members of the board, on the other, speaking to the same subject. The subject-matter of their alleged statements was the extent of the district and the amount of land to be assessed for school purposes. It is quite evident that, if there was any misunderstanding at all upon the question, it was due to the fact that the school officers spoke with a knowledge of the law of the province on these matters, and Mr. Mann heard in actual, probably, but certainly not in legal, ignorance thereof.

Substantially all that is claimed by defendant by way of misrepresentation was that the school officers stated to Mr. Mann that the limits of the district were the same as the city, and that all the lands in the district were subject to taxation for school purposes. These statements, interpreted in the light of the laws to which we have already referred, were literally true. The district had the same limits as the city, but the law provided for the anomaly of two districts having the same boundaries. The school officers had the right to assume that one

there for the purpose of buying debentures understood the laws pertaining to such obligations. These alleged statements are readily seen to relate themselves exclusively to the laws when we consider them to be, as they are, but opinions as to the way in which the laws affect property within the geographical lines of the district. At the very best for defendant, the statements direct a scrutiny of the law as the only criterion of their credibility.

Together with the alleged statements to Mr. Mann, the officers of the board exhibited a document, known as "Information, re Sale of Debentures," containing statistics relating to the extent of the district and the amount of taxable property, with other pertinent information. This statement has, indeed, an ambiguity in it, which is resolvable, however, when read in the light of the law, or, at the least, its terms are sufficient to excite inquiry to one heeding the law. The area of the district is given therein as "7,850 acres, same as city of Regina." In the same statement, however, the city's net assessment is given as $54,966,142, and that of the district (having the same area!) at $50,711,054. School rates are based upon the municipal assessment, and the collection is done by the city officials (section 89, chapter 101, Exhibit 3J), and, "subject to the School Act" (thus referring the inquirer to the sections which provide for separate schools), the property liable to be taxed for school purposes shall be that under taxation for municipal purposes (section 90, chapter 101). To one, then, with knowledge of the pertinent laws, the ambiguities of this statement disappear—the public school district has a tax roll of $4,255,088 less than that of the city, because there is a separate district in the same area. This document must be construed as a whole; so construed, it does not misrepresent. The authorities offered as typical cases of misrepresentation of fact justifying rescission (Long v. Athol, 196 Mass. 497, 82 N. E. 665, 17 L. R. A. [N. S.] 96, and McManus v. Philadelphia, 211 Pa. 394, 60 Atl. 1001) present facts so at variance in character with those before us as to be of no persuasion to an opinion contrary to the above.

[8] It is the first two defenses which are most extensively argued. At great length both sides, searching ancient authorities, discuss the necessity for a corporate seal in the contract between plaintiff and defendant, and earnestly are argued the features of the so-called contract which, defendant claims, demanded ultra vires acts of the plaintiff. What counsel on both sides mean by the contract here is the written proposition of defendant, which we have quoted in the statement of the case, followed by the resolution of the board accepting the same, which latter, defendant claims, should have been sealed of record to be valid. The question of necessity for a seal is important only in the view which may be taken that the ultra vires terms may be eliminated, leaving a complete agreement within the power of the district to make. It seems, therefore, advisable to notice it, considering the value attached to it by counsel on both sides.

Passing upon the question, we reach the conclusion that, at common law, a seal was not necessary in such a situation as here. The corporation, by the statute, consisted of the five trustees only; the

unsealed resolution was formally recorded as the act of the corporation in session, and we do not think that to have impressed a seal upon the record page would have added to the force thereof as binding the corporation to the act there engrossed. A by-law must be sealed, because the statute (106) says so; but nowhere else is it required that any other record page be sealed as a formality of official action. Section 88 says:

"No act or proceeding of any board shall be deemed valid or binding on any party which is not adopted at a regular or special meeting at which a quorum of the board is present."

Unless the converse, that any act or proceeding adopted at a proper meeting (within the corporate power to do, of course) is "valid or binding," is an interpretation in derogation of the common law in force in Saskatchewan, and hence to be seriously questioned, that would seem to be a necessary corollary. As far back as 1 Anne, Chief Justice Holt said (Mayor of Thetford's Case, 1 Salk. 192):

"That though a corporation cannot do an act in pais without their common seal, yet they may do an act upon record."

And the reporter says that this conclusion was reached "after search of precedents which were found both ways," a situation which two centuries of adjudication has not relieved. The discussions of Mr. Justice Gwynne and Mr. Justice Patterson, in deciding Bernardin v. Municipality of North Dufferin, 19 Canada Supreme Court, 581, we think, clarify the question as applied to the instant facts. The authorities upon which both sides here mainly rely are there considered and compared, to the result, we think, of justifying the conclusion that, except as particularly demanded in case of a by-law, intra vires acts of record, taken regularly at a proper meeting of the board in question, need not be sealed. It seems very clear that the English and Canadian decisions brought to our attention, when analyzed respecting their individual circumstances, justify the language of Mr. Justice Story in Bank v. Dandridge, 12 Wheat. 64–68, 6 L. Ed. 552, that the common-law doctrine that a seal is necessary to evidence acts of a corporation aggregate is "inapplicable to acts and votes passed by such corporations at corporate meetings."

The consideration given to the apparently conflicting authorities by the two justices in the Bernardin Case establishes that the classification of the exceptions to the rigid common-law rule, employed by the text-writers, such as Anson, is much too inelastic and restricted. The language used by Mr. Justice Gwynne, on pages 591 and 592 of the Bernardin Case, becomes all the more persuasive to the conclusion we reach here, when the difference between the North Dufferin and plaintiff corporations is understood. In the case of the municipality of North Dufferin, it was all the inhabitants who constituted the body corporate, whose authority is committed, in exercise, to a representative body (the council) for convenience. In the instant case, the very individuals who acted of record on April 16 are the corporation, not the ratepayers of the district.

While we have not passed unnoticed the numerous authorities cited on this question, it is impossible to consider them all. It is sufficient here to point out criteria which differentiate from the case at bar certain of them which superficially seem important. Thus Manning v. Winnipeg, 21 Manitoba, 203, turns on the fact that, by charter, the city council could act in the premises only by by-law which should be sealed, and the same limitation marked the municipal law of Ontario, which affected the decision in Leslie v. Township of Malahide, 15 Ontario, 4. In the former case on appeal, Mr. Chief Justice Howell distinguishes Bernardin v. Municipality of North Dufferin, supra, on this precise point, and directs attention to the divergence in facts in this respect between that case and a subsequent decision of the same court (Waterous v. Palmerston, 21 Canada Supreme Court, 556). In the case at bar no such imperative legislation exists.

We therefore see no objection in the common law to construing section 88 as sustaining the validity of a contract closed of record without seal, as here. Whether or not that part of the opinion of Mr. Chief Justice Wetmore in Brandon Construction Co. v. Saskatoon School Board, 5 Saskatchewan, 250, which is to the same effect, is mere obiter, as claimed by defendant, upon which we entertain no judgment, it seems to us to very clearly state the local law, with which the learned justice is, of course, the more familiar.

[9] We think, however, if the provision for payment of the debentures in money of the United States is to be regarded as a vital part of the contract, the latter bound neither party, sealed or otherwise. This was something which plaintiff could not lawfully agree to. Section 127, as we have seen, prescribes three alternative forms of proposed debentures, one of which, "or to the like effect," must be followed. The first two provide that the repayment shall be "in lawful money of Canada." The third form, which is the one the parties of necessity had in mind to, and did, follow, allows an alternative money in the shape of "pounds sterling." The fact that one alternative, only, to money of Canada, is specified, excludes the thought that any other was within the power of the board to agree to. It is notorious that rates of exchange between foreign countries fluctuate, so that there is no assurance that, even in two having the same standard of value, as well as the same denominations, the money of one may at any time be the equivalent in substantial value to that of the other; and we are decidedly of the opinion that the issue of debentures payable in the money of the United States is not a substantial compliance with the law requiring them to be made payable either in that of Canada or in pounds sterling. But the circumstances here constrain the court to hold that the provision in question does not avoid the contract as a whole. In Railroad Co. v. McCarthy, supra, the court says (page 267 of 96 U. S. [24 L. Ed. 693]):

"The doctrine of ultra vires, when invoked * * * should not be allowed to prevail when it would defeat the ends of justice or work a legal wrong."

And in Ill. Tr. & Sav. Bank v. Arkansas City (8 C. C. A.) 76 Fed. 271, 22 C. C. A. 171, 34 L. R. A. 518, it is said, in a syllabus by the court:

"When a divisible part of a contract is ultra vires, but that part is neither malum in se nor malum prohibitum, the remainder of the contract may be enforced, unless it appears from a consideration of the entire agreement that it would not have been made independently of the part which is void."

Here the parties put a construction upon their agreement which abandoned the ultra vires provision, thereby enabling us to say that that condition was not, in fact, an indivisible one. Of course it was not intrinsically illegal, nor may it be said that it was malum prohibitum; it was simply ultra vires—not specifically prohibited. We are therefore justified to treat the agreement or contract as if this clause were not in it. Chicago v. Sheldon, 9 Wall. 50, 54, 19 L. Ed. 594; Topliff v. Topliff, 122 U. S. 121, 131, 7 Sup. Ct. 1057, 30 L. Ed. 1110.

[10] But, even if we say that the agreement was void, still we think such a compact is capable of initiating mutual responsibilities upon the parties thereto which may become binding, as if by valid contract, as the parties separately proceed under it by way of execution and their procedure tends to and eventuates in a legal result, and, further, if each, in the process of execution, parts to the other with what is equivalent to consideration, i. e., in the dealings they have with each other respecting the matter, each has become under obligation to the other, or has parted with something because of the other. Any corporation, municipal or otherwise, may become bound by ratification, adoption, or acquiescence upon a contract, express or implied, which it might otherwise disavow, provided it is a compact into which its corporate powers permit it to enter. It is bound, in this respect, by the same considerations affecting individuals. This is the principle of the celebrated case of Curtis et al. v. Leavitt, 15 N. Y. 9, and the numerous cases cited amply support the text of Brice, Ultra Vires, chapter IV, section 220, and chapter VII, and of 28 Cyc. 675, 676. See City of Findlay v. Pertz (6 C. C. A.) 66 Fed. 427, 13 C. C. A. 559, 29 L. R. A. 188; First Nat. Bank of Red Oak v. City of Emmetsburg, 157 Iowa, 555, 138 N. W. 451, and notes thereto in L. R. A. 1915A, 990; Weil et al. v. Newbern, 126 Tenn. 223, 148 S. W. 680, Ann. Cas. 1913E, 25, and notes thereto in L. R. A. 1915A, 1023; Frank v. Board of Education of Jersey City, 90 N. J. Law, 273, 100 Atl. 211, L. R. A. 1917D, 206. This principle is involved in much of the argument in the decisions under the common law discussed in Bernardin v. Municipality of North Dufferin, supra, which find the special circumstances to avoid the common-law rule respecting the necessity for a seal.

It is a well-settled doctrine, of long standing, that corporations may be bound by implied contracts, to be deduced from authorized corporate acts, or even from parol acts of its officers, if not restricted by statute or charter, or if, properly executed, they would have been within specific or implied powers. Bank of Columbia v. Patterson, 7 Cranch, 299, 3 L. Ed. 351; Maher v. City of Chicago, 38 Ill. 266; Peterson v. Mayor, etc., of New York, 17 N. Y. 449, 453; 28 Cyc. 666, 667, and cases cited; Bernardin v. Municipality of North Dufferin, supra.

Upon these premises it seems incontestable that both plaintiff and defendant were bound in contractual implications respecting this is-

sue of debentures at the time when defendant signified its intention not to take it. What was the situation at this time? The defendant, relying upon the conduct of the board, had gone to substantial expense to prepare the debentures; had employed its energies towards finding a market therefor; had incurred substantial preliminary expenses, which were justified by its allowable confidence that the plaintiff would meet its obligations; had retained counsel to pass upon plaintiff's obligations. All of these outlays and inconveniences were factors of substantial damages it would sustain, should plaintiff finally refuse it the securities, and they were likewise substantial incidents binding upon plaintiff by way of executing a contract of which they were implications. On the other hand, the board had incurred expense in advertising for tenders, which was uselessly made, if it could not hold defendant to its proposition, for undoubtedly other tenders made in competition with defendant's were not available for the board's reconsideration. The latter, also, by way of executing the agreement, had met every demand made upon it by the defendant, even, in response to exigencies urged by defendant, going to the trouble of sending its officer to another province to get the minister's counter signature, and thus to anticipate, for defendant's benefit, the date of delivery of the first $100,000. Finally, it had executed, ready to deliver, securities which met the defendant's approval, and which were valid and indefeasible obligations of the district.

Pending the taking of these steps it had taken advantage of a law, knowledge of which concluded the defendant, and had entered into obligations requiring the expenditure of the money which these securities were to bring into its treasury. Failure to negotiate the debentures involved it in serious embarrassment, which only the default of the defendant brought about. These matters involved defendant in responsibility to plaintiff. If the contract of April 16 had avoided every technical criticism urged against it, i. e., if it had been sealed and had contained no terms and conditions which were beyond the corporate powers of the plaintiff, everything done between its date and the date of defendant's repudiation, by either defendant or plaintiff, was consistent therewith, and was an act pertinent to the execution thereof, wherefore the implied contract was precisely on valid lines. On the principle of the decisions in Township of King v. Beamish, 36 Q. L. R. 325, Marshall v. Queensborough, 1 Simons & Stuart, 523, Paterson v. Railway Co., 17 Grant, 521, and others of the same class, it is very difficult to see why mutuality has not here obtained, justifying relief at law, as in controversies of the character cited specific performance was enforced because of the inadequacy of the law.

We very much doubt, and are prepared to decide adversely, if necessary, to a decision in this case, whether defendant is competent to urge these alleged ultra vires conditions at this time. The analogy is compelling between this situation and that in State ex rel. v. Mastin, 103 Mo. 508, 15 S. W. 529, where it is held that a property owner, who assisted in instituting proceedings for the issue of local public obligations, and whose lands are being levied upon to secure their

ratable proportion of the debt thereby created, may not plead that the adventure in which he had a part was ultra vires.

[11] Only because of the able and elaborate arguments in this case have we extended this opinion to all the foregoing matters. We think that all defendant's misgivings concerning the validity of the issue were groundless, in view of the terms of sections 127 and 129. These fears must dissipate against the countersigning of the minister. When that is done, the obligations become "sufficient to bind the district and create a charge or lien against all school property or rates," for such counter signature "shall be conclusive evidence that the district has been legally constituted and that all the formalities in respect to such loan and the issue of such debentures shall be thereby conclusively established, and its validity shall not be questionable by any court in Saskatchewan, but the same shall, to the extent of the revenues of the district issuing the same, be of good and indefeasible security in the hands of any bona fide holder thereof." While ordinarily a bona fide holder is one who purchases in good faith without notice of alleged infirmities, that is not necessarily the only definition. The qualification of bona fides may be used only in the sense that fraud is not present in the transaction under consideration.

In O'Connor v. Gertgens, 85 Minn. 481, 485, 89 N. W. 871, it is said, in a syllabus prepared by the court, amplified in the opinion by consideration of the authorities, that:

"The expression 'bona fide purchaser' is oftentimes used ambiguously, and is construed in various ways. The context must be examined, and the expression considered with reference to its use and the connection in which it is found. It may mean without fraud or deception. It may mean without notice of others' rights. It sometimes signifies honesty of purpose, as distinguished from bad faith. To be a bona fide purchaser may, under some circumstances, require the payment of the consideration or purchase price, but not always. In the statute in question the term 'bona fide' was used as the opposite of 'mala fide.' "

Either the qualification "bona fide" in section 129 has that restricted sense, or we must think the provision in question to be a piece of superfluous legislation, for in Canada, as in the United States, the principle has long held that one is protected who purchases in good faith, without notice, from one who is aware of infirmities preceding execution, public securities which are regular and lawful on their face. Webb v. Commissioners of Herne Bay, L. R. 5 Q. B. 642. Before the act was passed, it was for the first purchaser of debentures to ascertain all facts pertinent to their validity. The legislation, however, seems intended to change the law by making the countersigning close the door to investigation of the antecedent situation and to establish the force of the issue as a lien. This statutory provision, to justify its enactment at all, appears to necessitate the construction of the term "bona fide holder" to mean one who then deals in good faith with the issuing body; i. e., a first purchaser who is free from actual fraud and who pays value. More than 40 years ago, one of the ablest courts of one of the middle western states (Griffith v. Burden, 35 Iowa, 138, 143) noted the steady tendency to strip from municipal securities the impedimenta of the law merchant, that the public inter-

est might be better served in their marketing. The legislation before us is capable of construction in line of that beneficent tendency of the law; otherwise, it has little function. We are constrained to give it a construction, if reasonably possible, which will magnify its usefulness.

If there is any difference in principle respecting the accrual of mutuality between the case of an accepted tender for the purchase of public securities and that of a common subscription, the favor, we think, would be with the former. In the case of a subscription, it is settled that substantial effort or expenditure in reliance thereon to further the object thereof will convert the gratuitous promise into a binding contract. 37 Cyc. 486; Sargent v. Nicholson, 25 Manitoba, 638. It can hardly be said that a formal tender in response to a public call offering public securities is ever a gratuitous promise; but, even so, the authorities just cited would bring defendant to court under circumstances as here.

This construction, we think, is consistent with that of analogous Saskatchewan statutes, 207 and 208 of the City Act, by Chief Justice Haultain in the trial of Canadian Agency, Limited, v. Tanner, 6 Saskatchewan Reports, 152, 161, in which the defendant was held to pay for city stock for which he had subscribed, and which had been approved by the minister of municipal affairs. Tanner's defense that there were infirmities antecedent to the minister's indorsement was held unavailable. Other cases cited (Harper v. Township of East Flamboro, 32 O. L. R. 490; Village of Georgetown v. Stinson, 23 Ontario Reports, 33) indicate general Canadian approval of legislation of this character.

We hold, therefore, that defendant was not justified, for anything shown upon this record, in its refusal to take the balance of this issue, and that there accrued to plaintiff, through its refusal, a right of action in damages.

[12] What should be the measure of damages? It is argued for defendant that, at the worst, damages would be nominal, on the theory that there is here but a breach of an agreement to loan money, and we are referred to Western Wagon Co. v. Welch, L. R. Chancery, 1892, 271, and Larios v. Bonany y Gurety, Privy Council Appeals, 5 L. R. 346. Our reading of these decisions fails to suggest much weight to the point as it is sought to apply it here. The latter case, particularly, is authority to the proposition that, even where the contract is merely to extend credit or to loan money, substantial damages may be recoverable, if substantial loss accrues to the obligor through reasonable reliance upon it. But, it seems to this court, an accepted offer to buy public securities, made in response to a public advertisement for tenders, is something more than an agreement to loan money; that it becomes a sale of negotiable paper, which differs from ordinary paper, in that it has many of the characteristics of chattels. Griffith v. Burden, supra.

We think it would be mischievous to hold that, until substantial progress was made by way of execution, such a contract was merely a naked pact. Public policy suggests insuperable defects in such a

doctrine. So far as we know, the exaction of a deposit guaranty by bidders has never been questioned, and in no case, so far as we know, involving a deposit of that character, has there been an attempt to so belittle the fundamental agreement. The right to exact a deposit has been upheld, because the right to actual damages is recognized. The dearth of authorities suggests that the point made by defendant's counsel is unusual. We are aware of but one. City of Junction City v. Bank, 96 Kan. 407, 153 Pac. 28. The syllabus is by the court, paragraph 5 reading:

"Where a city offers its paving bonds for sale and the successful and accepted bidder repudiates its contract of purchase, the city may recover from such bidder compensatory damages, even if these exceed the sum which the bidder puts up as a pledge of good faith accompanying the bid."

This case is not very fully reported, and the same justice writing the majority opinion indulges in a written dissent; but upon the precise question in the paragraph above quoted the court is unanimous. In the body of the majority opinion the court says of the deposit:

"The purpose of a certified check to accompany a bid is well known. It was a pledge of good faith, and to guarantee a recoupment or partial recoupment for any contingent loss to the vendor if the contract was broken by the vendee."

Recovery in this Kansas case was ordered, allowing the city damages for the difference between the bid and the price obtained on a resale, with a recovery of the excess of damages beyond the amount of the check.

Whatever view may be taken of the April agreement, i. e., whether it is a mere subscription, or a promise to loan money, or a contract void because ultra vires, the measure of recovery, under the circumstances here, should be the difference between the bid price of $400,-000 of the securities and the price obtained on resale, as it would be if the agreement is held to be a binding contract. If we must assume that the actionable contract between the parties is to be implied, one of the terms necessarily found is the agreement to pay 95 per cent. of par and accrued interest, because it is inevitable that all the dealings between the parties from April 12 to August 15 were on that basis.

We come now to consider the effect on the damages of defendant's subsequent offer of 92 per cent. of par. In this connection it is to be recalled that in its letter of August 15 defendant specifically extended the privilege to plaintiff to seek another market for the balance of the issue, and there is no evidence here tending to show that diligence and good faith were not exercised in the sale at 90, nor that the price was inadequate. This sale, then, would fix plaintiff's damages at the difference between 90 and 95 on $400,000, or $20,000, with interest, and we do not think that defendant's bid to pay 92, made pending the sale to a third party at 90, affects the situation. For the plaintiff to have accepted that bid meant an abandonment of its right of action against the defendant because of the latter's failure to take the issue at 95, for defendant extended a new bid on the theory that it was absolved from its obligations under the old tender. Besides, at the time defendant's new bid came in, plaintiff had undoubtedly

entered into obligations with the final purchaser, which were capable of giving it much embarrassment.

We find, therefore, for the plaintiff, with damages and interest as prayed for.